**William Josef BERKLEY, Petitioner,**

v.

**Nathaniel QUARTERMAN, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.**

**No. EP–06–CV–111–FM.**

United States District Court, W.D. Texas, El Paso Division.

Aug. 24, 2007.

Cori Ann Harbour, The Harbour Law Firm, P.C., Leon Schydlower, Louis E. Lopez, Attorneys at Law, El Paso, TX, for Petitioner.

Gena Blount Bunn, Office of the Texas Attorney General, Habeas Division, Tomee Morgan Heining, Office of the Attorney General, Capital Litigation Division, Austin, TX, for Respondent.

## MEMORANDUM OPINION AND ORDER

MONTALVO, District Judge.

Petitioner William Josef Berkley filed this federal habeas corpus action pursuant to Title 28, United States Code, Section 2254, collaterally attacking his otherwise final, April, 2002, El Paso County conviction for capital murder and sentence of death. For the reasons set forth in detail below, petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability from this Court.

## I. Statement of the Case

### A. The Crime

Sophia Martinez left her home in El Paso, Texas at approximate ten p.m. on the evening of March 10, 2000 in her red Grand Am sports car to meet a blind date.[1] Approximately twenty minutes later, bank security cameras located at an ATM near Sophia's home in El Paso recorded Sophia making a twenty dollar withdrawal from her account.[2] The same security cameras then recorded a male brandishing a handgun approach Sophia's vehicle and fire a shot into the vehicle which shattered a window in Sophia's vehicle.[3] The security cameras next recorded the male assailant's entry into the rear seat of the driver's side

---

1. Statement of Facts from petitioner's trial ("S.F. Trial"), Volume 68, testimony of Mary Ann Martinez, at pp. 35–38.

2. A bank security supervisor testified at petitioner's trial about the location and method of operation of the three security cameras which recorded the relevant events on March 10, 2000 and authenticated the videotape recordings of those events, which were admitted into evidence as State Exhibit nos. 2 and 3. S.F. Trial, Volume 68, testimony of Arthur Grijalva, at pp. 58–66. The same witness also authenticated several photographs made from the bank security videotapes which showed the assailant approach and fire a shot into Sophia's vehicle, then enter the rear seat of her vehicle before Sophia made a second withdrawal from her account. Id., at pp. 67–78. These photographs were admitted into evidence during petitioner's trial as State Exhibit nos. 4 through 20 and are found at S.F. Trial, Volume 91.

3. S.F. Trial, Volume 68, testimony of Arthur Grijalva, at pp. 69–75; State Exhibit nos. 4–14, S.F. Trial, Volume no. 91.

of the vehicle and a now-bloody-faced Sophia making a second withdrawal from her account, this time in the amount of two hundred dollars.[4] Sophia's vehicle then departed the security cameras' field of vision.

The following morning, Sophia's abandoned vehicle was located by New Mexico State Police in a desert area not far from El Paso.[5] There were numerous blood stains apparent on the interior of Sophia's vehicle.[6] Later the same date, El Paso police found Sophia's lifeless body laying face up beside a dirt road in an isolated location near a well.[7] An autopsy revealed Sophia had been shot five times in the head.[8] Vaginal swabs revealed Sophia had engaged in intercourse shortly before her death.[9]

### B. *Petitioner's Confessions*

More than six months later, El Paso police arrested petitioner, who gave a two-page written statement in which he stated (1) his gun went off as he approached Sophia's vehicle, (2) he then entered her vehicle, directed her to make a $200 withdrawal from her account, and directed her to drive her vehicle away from the ATM to a deserted area, (3) when they arrived at that location, "the girl" initiated multiple episodes of sexual relations between them, (4) when she attempted to hug him, his

---

**4.** S.F. Trial, Volume 68, testimony of Arthur Grijalva, at pp. 75–78; State Exhibit nos. 12–20, S.F. Trial, Volume 91.

**5.** S.F. Trial, Volume 68, testimony of Letitia Olivas, at pp. 96–101.

Photographs of the location where Sophia's vehicle was recovered were admitted during petitioner's trial as State Exhibit nos. 51–52 and appear in S.F. Trial, Volume 91.

In addition, photographs of the damage to Sophia's vehicle when it apparently was driven through a barbed-wire fence were admitted as State Exhibit nos. 21–27 and appear in S.F. Trial, Volume 91. S.F. Trial, Volume 68, testimony of Letitia Olivas, at pp. 101–05.

**6.** S.F. Trial, Volume 68, testimony of Letitia Olivas, at pp. 104–05. Photographs of the apparent blood stains were admitted during petitioner's trial as State Exhibit nos. 26–31 and appear in S.F. Trial, Volume 91.

**7.** S.F. Trial, Volume 68, testimony of Letitia Olivas, at pp. 107, 113–20. A videotape of the scene where Sophia's body was found was admitted into evidence during petitioner's trial as State Exhibit no. 118. Photographs of Sophia's body and the scene in question were admitted as State Exhibit nos. 32–41 and appear in S.F. Trial, Volume 91.

**8.** S.F. Trial, Volume 68, testimony of Juan Contin, at pp. 195–269.

The medical examiner who performed the autopsy on Sophia's body testified in perti-

nent part that (1) four bullets entered Sophia's face, (2) three of these penetrated her skull and went through the brain, (3) each of these three wounds would have been fatal by itself, (4) a fourth, non-fatal, wound penetrated Sophia's left cheek next to the nose but was stopped by the bone beneath her left eye, (5) this fourth wound, while not fatal, would most certainly have been extremely painful, (6) there was a fifth, grazing, bullet wound to the left side of her face which did not penetrate the skin, (7) the blood flow from Sophia's wounds suggested she was upright or seated inside a vehicle when she sustained the fourth bullet wound but was probably leaning to her right when she sustained the second and third wounds he identified to her face, (8) gunpowder residue and tattooing on Sophia's face suggested one of the shots fired into her face was fired from close range, (9) Sophia's blood showed no signs of alcohol or drugs, and (10) Sophia died as a result of multiple gunshot wounds to the head, three of which would have been fatal individually. *Id.*, at pp. 209–42, 269. Dr. Contin also testified he could not determine the precise order or sequence of Sophia's gunshot wounds. *Id.*, at pp. 211, 252–53, 256.

**9.** S.F. Trial, Volume 68, testimony of Juan Contin, at pp. 206–09.

Dr. Contin testified there was no evidence of injury to Sophia's genitals and he could not determine whether she had been sexually assaulted. *Id.*, at pp. 206–08, 248, 257, 259.

gun "went off" again, (5) he passed out and did not wake up for several hours, (6) when he did so, he saw "the girl" laying on the ground, (7) he "freaked out" and drove her car to another part of the desert where he drove it off the road, and (8) he then walked home.[10]

Two days after petitioner gave his first written statement, petitioner's father notified police petitioner wished to make another statement.[11] In his second, far more detailed, written statement, petitioner stated (1) the murder weapon was a .22 caliber handgun he had secretly purloined from his father, (2) his close friend Michael Jacques had played an integral role in the planning and execution of the robbery as well as the disposal of Sophia's car, and (3) he later burned "the girl's" driver's license in a barbeque grill.[12]

## C. *Indictment*

On December 19, 2000, an El Paso County grand jury indicted petitioner on a single Count of capital murder, to wit, intentionally causing Sophia Martinez's death by shooting her with a firearm in the course of committing and attempting to commit the predicate offenses of robbery, kidnaping, and aggravated sexual assault of Sophia.[13]

## D. *Guilt–Innocence Phase of Trial*

The guilt-innocence phase of petitioner's trial commenced on April 15, 2002.

### 1. *The Prosecution's Evidence*

In addition to the testimony summarized above, petitioner's jury heard the estranged wife of Michael Jacques testify that, the day after the robbery and murder, she observed a set of car keys and a driver's license belonging to Sophia Martinez lying on the counter of her kitchen and Sophia's driver's license was later burned in a barbeque grill.[14]

An El Paso Police officer and FBI agent both testified regarding the discovery of a .22 caliber handgun and ammunition for same inside a night-stand drawer in the master bedroom of petitioner's parents' home.[15]

---

**10.** Petitioner's first, two-page. written statement, given October 1, 2000, was admitted into evidence during petitioner's trial as State Exhibit no. 109 and appears in S.F. Trial, Volume 92.

That statement was also read, virtually verbatim, into the record during the trial testimony of the El Paso Police Detective who took petitioner's first statement. S.F. Trial, Volume 69, testimony of Antonio Tabullo, at pp. 101–04. Detective Tabullo testified without contradiction during petitioner's trial that petitioner's first statement was given voluntarily, without any threats, coercion, or promises having been made to induce same. *Id.,* at pp. 94–95, 109–10.

**11.** S.F. Trial, Volume 69, testimony of Karen Kozak, at pp. 131–51. Sergeant Kozak testified petitioner's second statement was also free from any coercion, duress, or promises of inducement. *Id.,* at pp. 131–51, 272.

**12.** Petitioner's second, six-page, written statement, dated October 3, 2000, was admitted

into evidence as State Exhibit no. 114 and appears in S.F. Trial, Volume 92. Substantial portions of this second statement were read to the jury verbatim as well. S.F. Trial, Volume 69, testimony of Karen Kozak, at pp. 235–65.

**13.** Transcript of the pleadings. motions, and other documents filed in petitioner's state trial court proceedings (henceforth "Trial Transcript"), Volume I, at p. 3.

Another copy of the indictment against petitioner appears in the state court records before this Court in the records relating to petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript"), Volume I, at p. 1.

**14.** S.F. Trial, Volume 68, testimony of Heather Jacques, at pp. 307–13.

**15.** S.F. Trial, Volume 69, testimony of Martin Hernandez, at pp. 18–34; testimony of Eric Swanson, at pp. 43–48.

An El Paso Police officer testified regarding the discovery on the roof of the apartment building where Michael Jacques and petitioner had resided in March, 2000 of a set of car keys which fit the ignition and trunk of Sophia's vehicle.[16]

A firearms expert testified (1) the .22 caliber handgun located in the Berkley home had a trigger pull of over nine pounds on double-action and over six pounds on single-action and (2) she was unable to perform a comparison between bullets she test-fired from that handgun and the four bullet fragments removed from Sophia's head because the latter were too badly damaged to permit comparison.[17]

An FBI DNA examiner and a Texas Department of Public Safety crime lab employee testified petitioner's DNA matched that of the sperm fraction recovered from Sophia Martinez's vaginal swabs.[18]

### 2. The Defense's Evidence

Petitioner's father testified (1) petitioner introduced him to a girl named "Sophia" in February, 2000 whom he believed to be Sophia Martinez and (2) he did not believe his .22 caliber handgun had been out of his home during March, 2000.[19] However, during cross-examination petitioner's father admitted that (1) he could not be certain his .22 caliber handgun had not left his home in March, 2000 and (2) neither of petitioner's confessions included any indication petitioner knew his victim.[20]

Douglas Bosanko, the owner of a wrecker and locksmith company, testified that (1) on the night of Sophia's robbery and murder, he passed the location where Sophia's vehicle was abandoned at a high rate of speed and observed a vehicle 25–30 feet off the roadway and saw the dome light inside that vehicle come on and saw a figure get out of the vehicle, (2) about an hour to eighty minutes later, as he returned past the same location, he observed the vehicle again but saw no one near the vehicle, (3) when he drove on to an intersection three-to-four miles down the road, where he observed a Hispanic male pacing back and forth, (4) he stopped to ask this person whether he needed a ride, (5) the Hispanic male said he was waiting for his buddy to give him a ride, (6) the person he saw pacing at the intersection was not petitioner, and (7) he could *not* identify the Hispanic male he observed pacing at that location was the same person he had seen more than an hour before exit the abandoned vehicle several miles back up the road.[21] Bosanko testified he contacted police shortly after learning of Sophia's murder and helped police develop a composite sketch of the Hispanic male he had observed on the night in question.[22] He also testified he subsequently was unable to identify anyone in a pair of police photo arrays but, later, identified a person whom he observed through a glass window.[23]

---

**16.** S.F. Trial, Volume 69, testimony of Juan Montelongo, at pp. 54–59.

**17.** S.F. Trial, Volume 69, testimony of Sally Grew, at pp. 161–202.

**18.** S.F. Trial, Volume 70, testimony of Alan M. Giusti, at pp. 12–23; testimony of Christine Ceniceros, at pp. 37–54.
 Examination of Sophia Martinez's oral swabs yielded no sperm. *Id.*, testimony of Christine Ceniceros, at p. 64.

**19.** S.F. Trial, Volume 70, testimony of Steven Bruce Berkley, at pp. 99–101.

**20.** *Id.*, at pp. 104–06, 114, 122–25.

**21.** S.F. Trial, Volume 71, testimony of Douglas Richard Bosanko, at pp. 11–38.

**22.** *Id.*, at pp. 38–41.

**23.** *Id.*, at pp. 41, 43–45, 60–63.

### 3. *Prosecution's Rebuttal Evidence*

A pair of El Paso Police officers each testified (1) Bosanko was unable to identify anyone in the lone photo array shown to him on March 13, 2000, (2) Bosanko was later taken to police headquarters and given an opportunity to view a former boyfriend of Sophia Martinez named Jose Hernandez, but (3) Bosanko was unable to identify Hernandez as the person he had seen several miles from the location where Sophia's vehicle was abandoned on the night of her murder.[24]

Sophia's mother testified she was very close with Sophia, she had never heard of petitioner before Sophia's murder, and she was not aware of Sophia ever having dated petitioner.[25]

Jose Hernandez testified (1) his romantic relationship with Sophia had cooled months before her murder, (2) he spent the evening before and the night of Sophia's murder with his girlfriend at his parents' home watching television, (3) he took his girlfriend home around 2 a.m., and (4) he had nothing to do with Sophia's murder.[26]

### 4. *Verdict*

On April 19, 2002, the jury returned its verdict, finding petitioner guilty of capital murder.[27]

### E. *Punishment Phase of Trial*

The punishment phase of petitioner's capital trial commenced later that same date.

#### 1. *The Prosecution's Evidence*

One of petitioner's former neighbors testified that (1) one evening in March, 20000, petitioner borrowed a dark sweatshirt and knit cap from her and her roommate, (2) the following afternoon, petitioner asked her to give him an alibi if the police asked her where he had been the previous night, and (3) she had twice seen petitioner under the influence of narcotics.[28]

Sophia Martinez's mother testified Sophia's younger siblings had suffered since Sophia's violent death and that Sophia had been a good student who planned to attend college and study to become a teacher.[29]

Petitioner's former supervisor at the Army Exchange service testified she repeatedly counseled petitioner regarding his poor attendance, rude behavior with customers, and fighting with co-workers during the few months he worked under her but petitioner was non-responsive to her counseling and petitioner's reputation for being peaceful among his co-workers was bad.[30]

---

**24.** S.F. Trial, Volume 71, testimony of Jesus Pantoja, Jr., at pp. 72–92; testimony of Antonio Tabullo, at pp. 93–98.

 Detective Tabullo also testified he showed Bosanko a pair of photo arrays in October, 2000 which contained photographs of both petitioner and Michael Jacques but Bosanko was unable to identify anyone in either of those photo arrays. *Id.*, testimony of Antonio Tabullo, at pp. 95, 105. Detective Tabullo also testified he took a statement from Jose Hernandez on March 13, 2000 and, after a follow-up investigation, Hernandez was not arrested. *Id.*, at pp. 107–10.

**25.** S.F. Trial, Volume 71, testimony of Lourdes Licerio, at pp. 129–33.

**26.** S.F. Trial, Volume 71, testimony of Jose Hernandez, at pp. 115–24.

**27.** S.F. Trial, Volume 72, at pp. 17–20; Trial Transcript, Volume II, at p. 522.

**28.** S.F. Trial, Volume 72, testimony of Amanda Cepolski, at pp. 53–54, 75.

**29.** S.F. Trial, Volume 72, testimony of Lourdes Licerio, at pp. 94–96.

**30.** S.F. Trial, Volume 72, testimony of Susan Ann Standish, at pp. 97–104.

One of petitioner's former co-workers who also was a friend of petitioner's mother and had known petitioner since he was twelve years old testified petitioner (1) was perpetually disrespectful to his co-workers, mother, and elders, (2) often referred to woman as "bitches," (3) frequently carried a knife, and (4) often spoke ethnic slurs and made verbal threats against a female Asian co-worker.[31]

The loss prevention employee at petitioner's former place of employment testified about an incident in which petitioner was caught stealing food from his employer, confessed to the theft, and agreed to pay back the value of the food.[32]

One of petitioner's former girlfriends testified about numerous incidents in which petitioner behaved violently toward her and others, including instances in which petitioner choked her until she lost consciousness, threatened to kill her, and bragged about having beaten up a guy with a brick.[33]

Petitioner's seventeen-year-old former neighbor testified (1) petitioner frequently used marijuana, (2) the night before petitioner's arrest petitioner verbally threatened and actually cut the nose of one of their mutual acquaintances with a knife, (3) petitioner once showed him where petitioner's father kept his .22 caliber handgun hidden, (4) petitioner once drew a map to a location where petitioner claimed to have hidden a cache of weapons, and (5) the night before petitioner's arrest, petitioner identified an undercover police officer who was staking out petitioner's house and encouraged others to confront the officer.[34] The same witness also testified about (1) several letters petitioner had sent him while petitioner was in jail awaiting trial for Sophia's murder in which petitioner made repeated crude references to women and (2) an incident in which petitioner and the mother of petitioner's child had battled violently and petitioner had choked her until petitioner's father commanded petitioner to stop.[35]

An FBI agent testified about numerous letters petitioner sent to one of petitioner's girlfriends from jail in which petitioner made repeated professions of his love for the young woman but also included negative, crude, and threatening references toward his own mother.[36]

Heather Jacques returned to the stand and testified petitioner (1) often spoke derisively about his mother and said he wanted to "whack" her, (2) bragged about stabbing an ex-girlfriend with a fork, (3) dispassionately described assaulting a guy with a brick, and (4) often grabbed his toddler daughter's arm violently to get her to sit down.[37]

**31.** S.F. Trial, Volume 72, testimony of Theresa Rowland, at pp. 121–30.

**32.** S.F. Trial, Volume 72, testimony of Dolores Grass, at pp. 131–38.

**33.** S.F. Trial, Volume 72, testimony of Theresa Milan, at pp. 141–52.

**34.** S.F. Trial, Volume 72, testimony of Jack Gilliland, Jr., at pp. 168–86.

**35.** S.F. Trial, Volume 73, testimony of Jack Gilliland, Jr., at pp. 21–65. Petitioner's correspondence to Jack Gilliland, Jr. from jail was admitted into evidence during the punishment phase of petitioner's trial as State Exhibit nos. 141–44 and appear in S.F. Trial, Volume 92.

**36.** S.F. Trial, Volume 73, testimony of Kent J. Switzer, at pp. 72–81. The letters in question, addressed by petitioner to a Vikki Ramirez, were admitted into evidence during the punishment phase of petitioner's trial as State Exhibit nos. 136–40 and appear in S.F. Trial, Volume 92.

**37.** S.F. Trial, Volume 73, testimony of Heather Jacques, at pp. 82–91.

Another of petitioner's former neighbors testified (1) petitioner's parents cared and provided for petitioner, (2) petitioner was suspended in middle school for having struck a female student in the nose, (3) petitioner dropped out of high school, (4) he had observed petitioner abusing both marijuana and crack cocaine, and (5) as a child, petitioner once punched out a window because he was upset about the outcome of a neighborhood basketball game.[38]

A prosecution psychiatrist testified he (1) would describe a person possessing petitioner's history of violence as an antisocial personality, (2) would expect such a person to be a continuing threat to society, and (2) believed the best predictor of future violence is a person's past behavior.[39]

### 2. The Defense's Evidence

The father of a childhood friend of petitioner's testified he had known petitioner since he was seven years old and had never known petitioner to be violent or aggressive and petitioner's reputation in the community for being peaceful was good.[40]

A former childhood friend and classmate of petitioner testified petitioner possessing many redeeming qualities and petitioner's parents were nice people.[41]

A female friend of petitioner testified petitioner had a normal childhood, was less attentive when he took drugs, and was a "goofy" who could make others laugh.[42]

Petitioner's former wrestling coach testified petitioner showed potential talent and respect for him during practices but petitioner's ADHD caused petitioner attendance and academic problems which rendered petitioner ineligible for competition.[43]

Petitioner's father testified petitioner was eleven years old when he was sent off to fight in the first Gulf War, he did not return home on a permanent basis until petitioner was sixteen, and he suspected petitioner began abusing drugs during that period.[44]

A former classmate of petitioner testified petitioner had artistic talent and a good sense of humor and petitioner's parents took good care of petitioner when he was growing up.[45]

The mother of one of petitioner's childhood friends testified petitioner had always behaved respectfully toward her.[46]

The mother of petitioner's daughter testified (1) she had initiated the incident in which petitioner choked her by "racking" petitioner for having spoken with another

**38.** S.F. Trial, Volume 73, testimony of Michael W. Gilliland, at pp. 92–121.

**39.** S.F. Trial, Volume 73, testimony of Edward Brown Gripon, at pp. 146–74, 189–218, 231–39.

**40.** S.F. Trial, Volume 73, testimony of Antonio Rodarte, at pp. 252–60, 279. On cross-examination, this witness admitted he was unaware of any acts of violence by petitioner toward his girlfriends or others. *Id.*, at pp. 264–78.

**41.** S.F. Trial, Volume 73, testimony of Salvador Rodarte, at pp. 280–89.

**42.** S.F. Trial, Volume 74, testimony of Melissa Serrano, at pp. 7–16.

**43.** S.F. Trial, Volume 74, testimony of Carl Queen, at pp. 17–24.

**44.** S.F. Trial, Volume 74, testimony of Steven Bruce Berkley, at pp. 25–43.

**45.** S.F. Trial, Volume 74, testimony of Richard F. Morales, at pp. 47–56.

**46.** S.F. Trial, Volume 74, testimony of Alicia Rodarte, 58–62.

woman on the phone and (2) petitioner was good with their daughter.[47]

A defense psychologist testified (1) criminals with female victims were less likely to re-offend if sentenced to a prison term, (2) there is a very low incidence of recidivism among convicted capital murderers, (3) petitioner's use of a gun and his sexual assault of his victim were not good predictors of petitioner's propensity for future violence, (4) as a person ages, their propensity for violence diminishes, and (5) conditions in prison leave few opportunities for assaults.[48]

Petitioner's mother testified (1) she and petitioner had moved frequently when petitioner was growing up, (2) petitioner frequently missed his father growing up, (3) she learned petitioner had ADHD when petitioner was 15 years old, (4) until that time, petitioner had been a good student, (5) petitioner loves art work, (6) petitioner had no criminal record until this incident, (7) petitioner loves his daughter, (8) she and her husband had been good parents to petitioner, (9) she believed Michael Jacques had been a bad influence on petitioner, and (10) she did not accept the jury's guilty verdict.[49]

### 3. The Prosecution's Rebuttal

The Assistant Director of Security Threat group Management and vice-chair of Classification and records at the Texas Department of Criminal Justice ("TDCJ") testified (1) Texas prison inmates were ingenious when it comes to making home-make weapons, (2) assaults on TDCJ staff and other inmates have occurred even in the most secure portions of TDCJ facilities, (3) an officer was recently killed by a TDCJ inmate, (4) a group of inmates at a high security TDCJ facility who had excellent disciplinary records had recently escaped from administrative segregation and killed a police officer, and (5) inmates convicted of capital murder who receive a life sentence are placed in the general prison population.[50]

### 4. Verdict

On April 22, 2002, petitioner's jury returned its verdict at the punishment phase of trial, finding (1) beyond a reasonable doubt there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all of the evidence, including the circumstances of the offense, the petitioner's character and background, and the petitioner's personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment.[51]

### F. Direct Appeal

Petitioner filed his appellant's brief on April 16, 2004, urging a dozen points of

---

**47.** S.F. Trial, Volume 74, testimony of Mildred Crystal Dickey, at pp. 66–72. This witness admitted petitioner and her had fought violently on many occasions, petitioner rarely paid child support for their daughter, and petitioner was a "part-time dad, when it was convenient for him." *Id.*, at pp. 68–69.

**48.** S.F. Trial, Volume 74, testimony of James Schutte, at pp. 72–95.

**49.** S.F. Trial, Volume 74, testimony of Katica Berkley, at pp. 98–135. Mrs. Berkley admitted on cross-examination that she had never met Sophia Martinez and petitioner seemed perfectly normal between March 10, 2000 and the date of his arrest in October of that year. *Id.*, at pp. 131–33.

**50.** S.F. Trial, Volume 74, testimony of Salvador Buentello, at pp. 136–55.

**51.** S.F. Trial, Volume 75, at pp. 5–8; Trial Transcript, Volume II, at pp. 547–51.

error.[52] In an unpublished opinion issued April 6, 2005, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence. *Berkley v. State,* AP no. 74,336 (Tex.Crim.App. April 6, 2005). Petitioner did not thereafter seek certiorari review of his conviction or sentence from the United States Supreme Court.

## G. State Habeas Corpus Proceeding

On December 29, 2004, petitioner filed an application for state habeas corpus relief in which he urged nine claims for

relief.[53] On August 19, 2005, without holding an evidentiary hearing, the state trial court issued an Order containing its findings of fact, conclusions or law, and recommendation that state habeas corpus relief be denied.[54] On March 8, 2006, the Texas Court of Criminal Appeals issued an unpublished per curiam opinion in which it adopted the state trial court's findings and conclusions and denied state habeas relief. *Ex parte Berkley,* WR no. 63,079–01, 2006 WL 561467 (Tex.Crim.App. March 8, 2006).

**52.** Petitioner's points of error on direct appeal consisted of arguments that the trial court erred in (1) permitting the prosecution to employ "commitment questions" during voir dire, (2) denying petitioner's challenges for cause to venire members Sharon Ann Davis (based on her opinion as top the credibility of police officers) and Albert Ernest Lucero (based on his alleged predisposition to impose the death penalty on any person convicted of capital murder), (3) overruling petitioner's objection to evidence of petitioner's DNA profile, (4) denying petitioner's motion to strike expert testimony regarding petitioner's DNA profile matching the sperm fraction of Sophia Martinez's vaginal swabs, (5) overruling petitioner's objection to photographs of the deceased, (6) overruling petitioner's objections to the application paragraph of petitioner's guilt-innocence phase instructions based on the lack of a directive requiring the jury to agree unanimously regarding the specific manner in which petitioner committed capital murder, (7) overruling petitioner's objection to the restrictive definition of "mitigating evidence" contained in petitioner's punishment-phase jury instructions, (8) overruling petitioner's objection to the absence of a burden of proof on the second capital sentencing special issue, i.e., the mitigation special issue, in petitioner's punishment-phase jury charge, and (9) overruling petitioner's objection to the absence of a self-defense instruction in his punishment-phase jury charge.

**53.** State Habeas Transcript, Volume I, at pp. 25–63.

As grounds for relief in his state habeas application, petitioner argued (1) his rights under the Confrontation Clause and the Supreme Court's holding in *Brady v. Maryland*

were violated by virtue of the prosecution's failure to timely disclose to petitioner's trial counsel the fact prosecution rebuttal witness Jose Hernandez was under indictment for leaving the scene of an automotive accident at the time he testified at petitioner's trial, (2) his rights under the Confrontation Clause and the Supreme Court's holding in *Brady v. Maryland* were violated by virtue of the prosecution's failure to timely disclose to petitioner's trial counsel the fact Douglas Bosanko had identified Jose Hernandez as the person he saw pacing at an intersection several miles from the location where Sophia Martinez's vehicle was abandoned, (3) his rights under the Confrontation Clause and the Supreme Court's holding in *Brady v. Maryland* were violated by virtue of the prosecution's failure to timely disclose to petitioner's trial counsel the fact test results on petitioner's DNA sample had been tainted, (4) his confession was involuntary, (5) his trial counsel rendered ineffective assistance at the guilt-innocence phase of trial by failing to object to an unidentified sleeping juror, (6) he was denied the right to testify at the guilt-innocence phase of his trial when no one advised petitioner of his right to testify in contravention of his attorneys' advice, and (7) his trial counsel rendered ineffective assistance during the punishment phase of petitioner's trial by failing to (a) adequately investigate petitioner's background and history, (b) obtain expert assistance concerning petitioner's "troubled psychiatric" condition, and (c) object to the lack of a burden of proof instruction on the mitigation special issue.

**54.** State Habeas Transcript, Volume II, at pp. 595–631.

## H. *Federal Habeas Proceedings*

On October 6, 2006, petitioner filed his federal habeas corpus petition in this Court. *Docket entry no. 14.* Respondent filed his answer on December 1, 2006. *Docket entry no. 15.* On January 29, 2007, petitioner filed his reply to respondent's answer. *Docket entry no. 18.*

## II. *AEDPA Standard of Review*

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton,* 544 U.S. 133, 141, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005); *Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

 The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza,* 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' "). A state court's failure to cite governing Supreme Court authority does not, per se, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.' " *Mitchell v. Esparza,* 540 U.S. at 16, 124 S.Ct. at 10.

 Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1439; *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith,* 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan,* —— U.S. ——, ——, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)("The question under the AEDPA is not whether

a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins v. Smith,* 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent,* 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

■ Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado,* 541 U.S. 652, 660–61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.' "); *Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

■ The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. A petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan,* —— U.S. at ——, 127 S.Ct. at 1939–40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.' "); *Rice v. Collins,* 546 U.S. 333, 338–39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' "); *Miller–El v. Dretke.* 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005) ("we presume the Tex-

as court's factual findings to be sound unless Miller–El rebuts the 'presumption of correctness by clear and convincing evidence.' "); 28 U.S.C. § 2254(e)(1).

■ However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller–El v. Dretke,* 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

■ Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See St. Aubin v. Quarterman,* 470 F.3d 1096, 1100 (5th Cir.2006) (holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* —— U.S. ——, 127 S.Ct. 2133, 167 L.Ed.2d 869 (2007); *Amador v. Quarterman,* 458 F.3d 397, 410 (5th Cir.2006) (holding the same), *cert. denied,* —— U.S. ——, 127 S.Ct. 2129, 167 L.Ed.2d 866 (2007); *Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir.2003) .(holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004); *Anderson v. Johnson,* 338 F.3d 382, 390 (5th Cir.2003)

(holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir.2002) (en banc) (holding a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

### III. *Bias of Venire Member Lucero*

#### A. *The Claim*

In his first claim herein, petitioner argues he was denied his Sixth and Fourteenth Amendment right to trial before a fair and impartial jury when the state trial court overruled petitioner's challenge for cause to venire member Albert Ernest Lucero.[55]

#### B. *State Court Disposition*

Petitioner's third point of error in his appellant's brief argued the state trial court's failure to grant petitioner's challenge for cause to venire member Lucero *violated state law principles* which mandated the exclusion of any potential juror who would automatically answer the Texas capital sentencing scheme's future dangerousness special issue affirmatively based solely upon a finding of guilt on a charge of capital murder.[56] The Texas Court of Criminal Appeals carefully reviewed Lucero's voir dire examination, found Lucero gave vacillating answers regarding his ability to answer the future dangerousness special issue based on all of the evidence presented during both phases of a capital trial, and concluded the trial court's rejec-

tion of petitioner's challenge for cause was entitled to deference. *Berkley v. State,* AP–74,336 (Tex.Crim.App. April 6, 2005), slip op. at pp. 10–21. Petitioner did not include any grounds for relief in his state habeas corpus application complaining about the state trial court's failure to grant petitioner's challenge for cause to venire member Lucero.

#### C. *Procedural Default*

##### 1. *Failure to Exhaust State Remedies on Federal Claim*

Respondent correctly argues the point of error petitioner presented during his state direct appeal did not "fairly present" the Texas Court of Criminal Appeals with the same federal constitutional claim petitioner presents to this Court. Petitioner's third point of error on direct appeal included no citation to federal constitutional authority, no argument premised upon federal constitutional principle, nor any hint petitioner was urging anything other than a purely state law claim for relief. The only two authorities petitioner cited in support of his third point of error on direct appeal presented arguments that were exclusively state-law in nature. *See Banda v. State,* 890 S.W.2d 42, 54–55 (Tex.Crim. App.1994) (holding a state trial court properly refused a challenge for cause directed against a venire member who gave vacillating answers on whether he would automatically say "yes" to one of the punishment issues), *cert. denied,* 515 U.S. 1105, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995); *Gardner v. State,* 730 S.W.2d 675, 680–84 (Tex. Crim.App.1987) (holding state trial court properly granted the prosecution's chal-

---

**55.** Petitioner's Petition for Writ of Habeas Corpus, filed October 5, 2006, docket entry no. 14 (henceforth "Petition"), at pp. 19–23.

**56.** Petitioner's "Brief of Appellant" filed in petitioner's state direct appeal is included

among the state court records submitted to this Court by respondent. Petitioner's third point of error is found at pages 19–22 of that document.

lenge for cause to a venire member who expressed confusion over her ability to answer the former Texas capital sentencing special issue inquiring into whether the defendant had acted "deliberately" independently of her earlier finding beyond a reasonable doubt that the defendant had "intentionally" killed the victim), *cert. denied,* 484 U.S. 905, 108 S.Ct. 248, 98 L.Ed.2d 206 (1987). The Texas Court of Criminal Appeals' opinions in both Banda and Gardner relied upon and applied purely state-law principles. Nothing in petitioner's brief on direct appeal furnished the Texas Court of Criminal Appeals with any clue petitioner's third point of error was intended to assert a federal constitutional claim. The Texas Court of Criminal Appeals' opinion addressed petitioner's third point of error on direct appeal as a purely state-law claim.

Respondent correctly points out petitioner has procedurally defaulted on his *federal* constitutional claim because the Texas writ-abuse statute effectively precludes petitioner from returning to state court at this juncture to obtain a ruling on the merits of this new argument.

### 2. *Procedural Default Generally*

 Procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d

1 (1999). Procedural defaults only bar federal habeas review when the state procedural rule which forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state judicial review of the merits of a federal constitutional claim. *Ford v. Georgia,* 498 U.S. 411, 424, 111 S.Ct. 850, 857–58, 112 L.Ed.2d 935 (1991).

### 3. *Failure to Exhaust Produces Procedural Default*

 Before seeking federal habeas corpus relief, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' *federal* rights. *Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004); *O'Sullivan v. Boerckel,* 526 U.S. 838, 842, 119 S.Ct. 1728, 1731, 144 L.Ed.2d 1 (1999); *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); 28 U.S.C. § 2254(b)(1). To provide the State with this necessary "opportunity," the prisoner must "fairly present" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim. *See Baldwin v. Reese,* 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (rejecting the argument that a petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan v. Boerckel,* 526 U.S. at 844–45, 119 S.Ct. at 1732–33 (holding comity requires that a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that State's established

appellate review process); *Gray v. Netherland,* 518 U.S. 152, 162–63, 116 S.Ct. 2074, 2081, 135 L.Ed.2d 457 (1996) (holding that, for purposes of exhausting state remedies, a claim for *federal* relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and rejecting the contention that the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief). The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts and, thereby, to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. *Carey v. Saffold,* 536 U.S. 214, 220, 122 S.Ct. 2134, 2138, 153 L.Ed.2d 260 (2002); Duncan v. Walker, 533 U.S. 167, 179, 121 S.Ct. 2120, 2128, 150 L.Ed.2d 251 (2001); *O'Sullivan v. Boerckel,* 526 U.S. at 845, 119 S.Ct. at 1732; *Rose v. Lundy,* 455 U.S. 509, 518–19, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982).

■ Under the AEDPA, federal courts lack the power to grant habeas corpus relief on unexhausted claims. *Kunkle v. Dretke,* 352 F.3d 980, 988 (5th Cir.2003) ("28 U.S.C. § 2243(b)(1) requires that federal habeas petitioners fully exhaust remedies available in state court before proceeding in federal court."), *cert. denied,* 543 U.S. 835, 125 S.Ct. 250, 160 L.Ed.2d 56 (2004); *Riley v. Cockrell,* 339 F.3d 308, 318 (5th Cir.2003); *Anderson v. Johnson,* 338 F.3d 382, 386 (5th Cir.2003); *Henry v. Cockrell,* 327 F.3d 429, 432 (5th Cir.2003)("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."), *cert. denied,* 540 U.S. 956, 124 S.Ct. 408, 157 L.Ed.2d 293 (2003);

*Mercadel v. Cain,* 179 F.3d 271, 276–77 (5th Cir.1999); *Alexander v. Johnson,* 163 F.3d 906, 908 (5th Cir.1998); *Jones v. Jones,* 163 F.3d 285, 299 (5th Cir.1998), *cert. denied,* 528 U.S. 895, 120 S.Ct. 224, 145 L.Ed.2d 188 (1999). However, Title 28 U.S.C. § 2254(b)(2) empowers a federal habeas court to deny an exhausted claim on the merits. *Smith v. Cockrell,* 311 F.3d 661, 684 (5th Cir.2002), *cert. dism'd,* 541 U.S. 913, 124 S.Ct. 1652, 158 L.Ed.2d 263 (2004); *Daniel v. Cockrell,* 283 F.3d 697, 701–02 (5th Cir.2002), *cert. denied,* 537 U.S. 874, 123 S.Ct. 286, 154 L.Ed.2d 126 (2002). The exhaustion of *all* federal claims in state court is a fundamental prerequisite to requesting federal collateral relief under Title 28 U.S.C. Section 2254. *Wilder v. Cockrell,* 274 F.3d 255, 259 (5th Cir.2001); *Sterling v. Scott,* 57 F.3d 451, 453 (5th Cir.1995), *cert. denied,* 516 U.S. 1050, 116 S.Ct. 715, 133 L.Ed.2d 669 (1996); 28 U.S.C. § 2254(b)(1)(A).

■ In order to "exhaust" available state remedies, a petitioner must "fairly present" *all* of his claims to the state courts. *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor,* 404 U.S. at 270, 275–76, 92 S.Ct. 509, at 512–13, 30 L.Ed.2d 438 (1971); *Kunkle v. Dretke,* 352 F.3d at 988; *Riley v. Cockrell,* 339 F.3d at 318; *Anderson v. Johnson,* 338 F.3d at 386; *Jones v. Jones,* 163 F.3d at 296; *Shute v. State of Texas,* 117 F.3d at 237 ("a habeas petitioner 'must fairly apprize [sic] the highest court of his state of the federal rights which were allegedly violated.'"). In Texas, the highest state court with jurisdiction to review the validity of a state criminal conviction is the Texas Court of Criminal Appeals. *Richardson v. Procunier,* 762 F.2d 429, 431–32 (5th Cir.1985).

The exhaustion doctrine requires that the petitioner present his federal claim in a manner reasonably designed to afford the

State courts a meaningful opportunity to address same. The Supreme Court has succinctly explained the rationale behind the exhaustion requirement:

Exhaustion means more than notice. In requiring exhaustion of a federal claim in state court, Congress meant that exhaustion be serious and meaningful.

The purpose of exhaustion is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court. Comity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court. Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claim on the merits.

*Keeney v. Tamayo–Reyes,* 504 U.S. 1, 10, 112 S.Ct. 1715, 1720, 118 L.Ed.2d 318 (1992).

■ The exhaustion requirement is satisfied when the substance of the *federal* habeas claim has been "fairly presented" to the highest state court, i.e., the petitioner presents his claims before the state courts in a procedurally proper manner according to the rules of the state courts. *Baldwin v. Reese,* 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Moore v. Cain,* 298 F.3d 361, 364 (5th Cir.2002), *cert. denied,* 537 U.S. 1236, 123

S.Ct. 1360, 155 L.Ed.2d 202 (2003); *Mercadel v. Cain,* 179 F.3d at 275. However, the petitioner need not spell out each syllable of the claim before the state court for the claim to have been "fairly presented" and thereby fulfill the exhaustion requirement. *Riley v. Cockrell,* 339 F.3d at 318; *Fisher v. Texas,* 169 F.3d 295, 303 (5th Cir.1999).

■ The fundamental problem with petitioner's first claim for relief herein is that petitioner presents his complaints about the trial court's failure to exclude venire member Lucero to this Court in the guise of a Sixth and Fourteenth Amendment constitutional challenge to the fairness of his trial; the only similar complaints petitioner voiced on direct appeal were presented in the context of, and premised solely upon, state-law procedural principles. Thus, the legal arguments petitioner presents to this Court in support of his first claim herein are entirely different from those which he presented to the Texas Court of Criminal Appeals in his third point of error in his direct appeal.

■ The exhaustion requirement is not met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless,* 459 U.S. 4, 6–7, 103 S.Ct. 276, 277–78, 74 L.Ed.2d 3 (1982); *Riley v. Cockrell,* 339 F.3d at 318 ("It is not enough that the facts applicable to the federal claims were all before the State court, or that the petitioner made a similar state-law based claim. The federal claim must be the 'substantial equivalent' of the claim brought before the State court."); *Wilder v. Cockrell,* 274 F.3d at 259 ("where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement"); *Finley v. Johnson,* 243 F.3d 215, 219 (5th Cir.2001). Likewise, to have "fairly pre-

sented" his *federal* claim, the petitioner must have reasonably alerted the state courts to the *federal* nature of his claim. *Baldwin v. Reese*, 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Wilder v. Cockrell*, 274 F.3d at 260 ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights.").

The Fifth Circuit has consistently held federal habeas review on unexhausted claims presented by a convicted Texas criminal defendant is barred under the procedural default doctrine. *See Aguilar v. Dretke*, 428 F.3d at 533 (holding the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir.2004) (holding the violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim), *cert. denied*, 543 U.S. 1124, 125 S.Ct. 1067, 160 L.Ed.2d 1074 (2005); *Bagwell v. Dretke*, 372 F.3d 748, 755–56 (5th Cir.2004) (holding a petitioner procedurally defaulted by failing to "fairly present" a claim to the state courts in his state habeas corpus application), *cert. denied*, 543 U.S. 989, 125 S.Ct. 498, 160 L.Ed.2d 374 (2004); *Cotton v. Cockrell*, 343 F.3d 746, 755 (5th Cir.2003) (holding the Texas writ abuse doctrine is an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied*, 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004); *Henderson v. Cockrell*, 333 F.3d 592, 605 (5th Cir.2003) (recognizing the Texas writ-abuse doctrine has been strictly and regularly applied since before August, 1997), *cert. denied*, 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2004); *Smith v. Cockrell*, 311 F.3d 661, 684 (5th Cir.2002) (holding unexhausted claims were procedurally barred), *cert. dism'd*, 541 U.S. 913, 124 S.Ct. 1652, 158 L.Ed.2d 263 (2004); *Jones v. Johnson*, 171 F.3d 270, 276–77 (5th Cir.1999) (holding unexhausted ineffective assistance claim procedurally barred from federal habeas review), *cert. denied*, 527 U.S. 1059, 120 S.Ct. 29, 144 L.Ed.2d 832 (1999); *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir.1998) (holding unexhausted claims procedurally barred), *cert. denied*, 523 U.S. 1113, 118 S.Ct. 1793, 140 L.Ed.2d 933 (1998); *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997) (holding the Texas writ-abuse rule an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied*, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998).

 Section 5 of Article 11.071 of the Texas Code of Criminal procedure prohibits a successive state habeas corpus application except in limited circumstances which do not apply to petitioner's complaint about the violation of the presumption of innocence arising from the alleged vagueness of the first Texas capital sentencing special issue. See Art. 11.071, § 5, Tex.Code Crim. Proc. Ann. (Vernon Supp. 2006) (barring consideration on the merits of new claims contained in a subsequent state habeas corpus application unless either (1) the new claims could not have been presented in a previous application because the legal or factual basis for the new claims were unavailable at the time the previous application was filed; (2) by a preponderance of the evidence, but for a violation of the United States Constitution,

no rational juror could have found the applicant guilty beyond a reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States Constitution, no rational juror would have answered in the state's favor one or more of the capital sentencing special issues). Absolutely nothing prevented petitioner from asserting his Sixth and Fourteenth Amendment complaints about the state trial court's failure to exclude venire member Lucero in the course of his direct appeal or state habeas corpus proceeding. Likewise, petitioner alleges no specific facts and presents no evidence to this Court which satisfies either of the final two exceptions to the Texas writ-abuse barrier erected by Section 5 of Article 11.071. On the contrary, the evidence of petitioner's guilt was overwhelming, as was the evidence supporting the jury's answers to the petitioner's capital sentencing special issues.

Nothing in petitioner's appellant's brief or state habeas corpus application "fairly presented" the Texas Court of Criminal Appeals with the same federal constitutional arguments contained in petitioner's first claim for relief before this Court. If petitioner were to attempt at this juncture to return to state court and assert his *federal* constitutional complaints about the trial court's failure to exclude venire member Lucero in a successive state habeas application, the applicable provisions of the Texas writ-abuse statute would preclude him from doing so. Thus, petitioner failed to exhaust available state remedies on his first claim herein and, thereby, procedurally defaulted on same. *See Hughes v. Dretke,* 412 F.3d 582, 594–95 (5th Cir.2005) (holding petitioner procedurally defaulted on a jury misconduct claim by presenting the state courts with purely state-law arguments supporting same and waiting until he reached federal court to first urge federal constitutional arguments), *cert. de-*

nied, 546 U.S. 1177, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006); *Beazley v. Johnson,* 242 F.3d 248, 264–68 (5th Cir.2001) (holding petitioner procedurally defaulted on a claim by failing to present same to the Texas Court of Criminal Appeals either on direct appeal or in a state habeas corpus application where claim was readily available at the time petitioner filed his state habeas application), *cert. denied,* 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001); *Hicks v. Johnson,* 186 F.3d 634, 637–38 (5th Cir.1999) (petitioner procedurally defaulted on an unexhausted claim for relief), *cert. denied,* 528 U.S. 1132, 120 S.Ct. 976, 145 L.Ed.2d 844 (2000).

Petitioner's attempt to convert a purely state-law argument regarding venire member Lucero's eligibility for jury service into a federal constitutional claim is untimely procedurally barred from merits review in this federal habeas corpus proceeding.

### 4. *Exceptions Inapplicable*

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. at 2565; *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson,* 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies

the "cause" prong of the exception to the procedural default doctrine). While a showing of ineffective assistance can satisfy the "cause" prong of the "cause · and actual prejudice" exception to the procedural default doctrine, petitioner does not argue or allege any specific facts suggesting his state appellate counsel's failure to raise *federal* constitutional claims attacking the trial court's failure to exclude venire member Lucero rendered said counsel's performance ineffective under the standard of *Strickland v. Washington.*

 In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley,* 505 U.S. 333, 335–36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley,* 505 U.S. at 346–48, 112 S.Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley,* 505 U.S. at 347, 112 S.Ct. at 2523. Petitioner has alleged no specific facts satisfying this "factual innocence" standard. Because petitioner has failed to satisfy the "actual innocence" test, he is not entitled to relief from his procedural default under the fundamental miscarriage of justice exception to the procedural default doctrine.

### D. *No Merit*

#### 1. *De Novo Standard of Review*

 Alternatively, petitioner's federal constitutional complaint about the trial court's failure to exclude venire member Lucero possesses no merit. Because the state courts never addressed the merits of petitioner's *federal constitutional* complaint regarding venire member Lucero's alleged bias, this Court's review of this unadjudicated claim is necessarily *de novo.* See *Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

#### 2. *Lucero's Voir Dire Examination*

This Court has painstakingly reviewed the entirety of Albert Ernest Lucero's voir dire examination and finds nothing erroneous with the state trial court's conclusion that Lucero could properly decide the Texas capital sentencing special issues based upon the evidence to be presented during both phases of a capital trial. The Texas Court of Criminal Appeals accurately described Lucero as a "vacillating" juror.

During his initial voir dire examination by the prosecution, Lucero repeatedly stated he would answer the Texas capital sentencing special issues based on the evidence presented during trial, would not automatically answer the first special issue (regarding future dangerousness) in a particular way just to reach a particular result, and could fairly consider imposing a sentence of life imprisonment.[57]

---

57. S.F. Trial, Volume 60, voir dire examina- tion of Albert Ernest Lucero, at pp. 48, 57,

Lucero's resoluteness survived the initial wave of questions by petitioner's trial counsel:

Q So if someone commits murder, they should pay with their own life?

A Yes, sir.

Q With that in mind, since you believe that deep down, you're not going to be able to consider life in prison, are you?

A On hearing the facts, yes, sir.

* * *

Q And because it is so strong, aren't you automatically—if you believed someone was guilty of capital murder, aren't you going to sentence them to death based on your belief?

A If the facts are there, yes.

* * *

Q You see, these issues up here (indicating), they pretty much give the juror latitude to go one way or the other. But what I'm hearing is, if you believe someone committed capital murder, you are going to give them the death penalty, right?

A If the facts are there, yes.

Q The facts that they committed capital murder?

A Yes.

Q If those facts are there, you will give them the death penalty, right?

A I don't know.[58]

The prosecution's follow-up questioning elicited similar responses:

Q Then there would be additional evidence.

A Right.

Q Is that the facts you're referring to?

A Yes.

Q Because you can't—and that's why I asked you. When I asked you if you would automatically do it, you indicated you would not, that you would listen to the evidence—

A I would listen to the evidence.

Q—and—and then decide whether or not it's life in prison or the death penalty.

A Right. yes.

Q Can you do that fairly?

A Yes.

Q And you can keep an open mind until you hear the facts?

A Yes.

Q Okay. And after listening to the evidence in this case, if all the facts indicated that it should be life in prison, could you do that?

A No.

Q Even if the facts demonstrated that?

A Say it one more time. I'm confused.

Q I'm confusing you. I'm sorry. If the facts indicated that the sentence should be life in prison—in other words, if there were mitigating circumstances that said that, could you do that?

A Yes.

Q And if the facts warranted that the death penalty should be imposed, could you do that?

A Yes.

Q So you can consider both, until you hear the facts?

A Yes.[59]

Petitioner's trial counsel once again attempted to get Lucero to confess some sort of bias:

60–61, 73–75.

**58.** *Id.,* at pp. 80–82.

**59.** *Id.,* at pp. 83–84.

Q Sir, if you found someone guilty of capital murder, could you give them a life sentence?

A Yes.

* * *

Q Right. Does that mean, since you believe in it, if you've found someone guilty of capital murder, you're giving them the death penalty? Is that what that means?

A Listening to—on that, I would say no, then.

Q You would say—why would you say no?

A Depending how everything went.

* * *

Q * * * So my honest question to you is: Can you really keep an open mind as to life versus death if you found someone guilty of capital murder? Can you do that?

A Yes, I can.

* * *

Q Am I right or wrong? Can you keep an open mind in this case, sir?

A Yes, I can.

Q If I[sic] find someone guilty of capital murder, are you going to automatically give them the death penalty?

A Yes.

Q All right.[60]

The prosecution's efforts to rehabilitate Lucero then met with confusion:

Q If I've confused you in any way, I apologize for that. The issue is, as Mr. DeKoatz said, keeping an open mind, not making a determination until you hear the facts.

A Until I hear the facts.

* * *

Q Okay, if the person's found guilty of capital murder, you can't automatically do anything without hearing the second part of that trial, is what is required. Do you understand what I'm saying?

A Yes, ma'am.

* * *

Q Okay. And you understand what the law requires. He's asking you, can you honestly consider everything openly and fairly? And at the outset, as I said, it's okay to have your own views and feelings. And his concern is great. *Can you set aside your feelings, and answer those questions based on the facts and circumstances or on the evidence in this case.*

A *Yes.*

Q And you can openly consider life, as well as the death penalty, and you're not going to automatically impose the death penalty?

A I see what you mean.

Q Are you automatically going to impose the death penalty simply based on the fact the person's found guilty?

A Yes.

Q You will?

A Yes, I will.

Q Under all circumstances?

A (Indicating.)

Q I'm sorry, you have to answer out loud.

A Yes.

Q So you could not consider life in prison?

A No.

Q Never?

A Yes.

Q Okay. Why don't you reiterate it back to me.

 MR. DeKOATZ: Object, been asked and answered.

**60.** *Id.,* at pp. 84–87.

THE COURT: Overruled, sir.

Q (BY MS. AGUILAR) Okay? because I'm not sure I haven't confused you at this point.

A If the person—if the person is found guilty with the facts and everything, yes, I do believe in the death penalty.

Q Okay. And are you going to impose that regardless of what the facts and circumstances shows?

A Oh, regardless?

Q Yes. In other words—

MR. DeKOATZ: I'm going to object to the form because she's not specifying which facts and circumstances, Judge

THE COURT: Overruled, sir.

Q (BY MS. AGUILAR) I'm going to start over just a little bit.

* * *

Q So what the law requires is that a person be able to answer those questions based on the facts and circumstances, not just on the finding of guilt, because, you know, in the second part, we're going to have to prove one and two to you beyond a reasonable doubt.

A Right.

* * *

Q * * * Now, my question is, can you consider life in prison if the facts and circumstances justify it—

A Yes.

Q—or show it?

A Yes.

Q And could you consider the death penalty if that's what the facts and circumstances show?

A Yes.[61]

Once again, petitioner's trial counsel attempted to lure Lucero into an admission of bias:

Q Sir, in relation to question number one—

A Right.

Q—if you've found someone guilty of capital murder, you're going to believe that they're a future danger to society, right?

A Right.

Q Just based on the fact that they were convicted of capital murder?

A Right.

* * *

Q Now, based on that belief—back to my question again—if you find someone guilty of capital murder, that fact alone, you gonna give them the death penalty, right?

A No.

Q Tell me why I'm wrong.

A It all—depending how the case goes.

Q Okay. Let's say the case results in a guilt verdict of capital murder. You found that an individual is guilty, let's say, of murdering someone and raping them. Okay? That fact alone, you believe they've forfeited their right to live, right?

A No, I don't believe so.

* * *

Q Okay. So you are predisposed to believe that we should execute everyone who commits murder, correct?

A Yeah.

Q And for that reason, you cannot legitimately consider a life sentence for capital murder, can you?

A Well, it all depends.

Q Everything depends on everything. But my question is: Based on your views and your convictions against murderers and your belief that we shouldn't house them in the pen, we ought to kill

---

61. *Id.,* at pp. 88–93.

them, you can't honestly consider a life sentence in this case, can you?

A No.

MR. DeKOATZ: Thank you very much. Pass the juror.[62]

The prosecution made a final effort at rehabilitation:

Q That's where the automatic, not automatic part comes in. Okay? Can you honestly and openly consider the full range of punishment in a capital murder, that being life in prison, as well as the death penalty depending on the facts and circumstances?

A Yes, ma'am.

Q And if the facts and circumstances demonstrate it or warrant it, that the person deserves or gets life in prison, can you do that?

A Yes, I can.

Q Or the opposite?

A The opposite, yeah.[63]

After listening to argument by counsel for both parties, the trial court denied petitioner's challenge for cause to Lucero.[64]

This Court finds absolutely nothing in Lucero's voir dire answers which casts any doubt of venire member Lucero's *federal constitutional* qualifications for jury service during petitioner's capital murder trial. Counsel for both the State and defense focused their voir dire examination of venire member Lucero on issues unrelated to the pivotal issue of Lucero's *federal constitutional* qualifications under applicable Supreme Court precedent. Simply put, with a single exception, neither party asked Lucero the type of question necessary to establish him as an unqualified juror under applicable federal case law. In fact, at times, Lucero's voir dire examination appeared to have been conducted by attor-

neys totally unfamiliar with the applicable *federal constitutional* standard for establishing juror qualifications in capital murder trials. This is quite possibly because the parties were not attempting to satisfy the *federal constitutional* standard for showing juror ineligibility.

### 3. *Clearly Established Federal Law*

In *Witherspoon v. Illinois*, 391 U.S. 510, 521–23, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776 (1968), the Supreme Court held that prospective jurors may not be excused from sitting on a capital jury simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. Rather, the Supreme Court held as follows:

The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty regardless of the facts and circumstances that might emerge in the course of the proceedings.

*Witherspoon v. Illinois*, 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21.

In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court emphasized the limitations *Witherspoon* imposed on the ability of the State to exclude members of a jury venire from service on a petit capital jury and directly addressed jury selection in Texas capital murder trials:

a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance

---

**62.** *Id.,* at pp. 93–96.

**63.** *Id.,* at p. 100.

**64.** *Id.,* at pp. 101–02.

of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Adams v. Texas,* 448 U.S. at 45, 100 S.Ct. at 2526.

In *Adams,* the Supreme Court further discussed the many practical consequences of its *Witherspoon* holding:

If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality. * * *

[A] Texas juror's views about the death penalty might influence the manner in which he performs his role but without exceeding the "guided jury discretion" permitted him under Texas law. In such circumstances, he could not be excluded consistently with *Witherspoon.*

The State could, consistently with *Witherspoon,* use § 12.31(b) to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths. But the use of § 12.31(b) to exclude jurors on broader grounds based on their opinions concerning the death penalty is impermissible. * * *

[N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty. * * * Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond a reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt. * * * [T]he State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths.

*Adams v. Texas,* 448 U.S. at 46–50, 100 S.Ct. at 2527–29 (citations omitted).

In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court further clarified its holdings in *Witherspoon* and *Adams,* holding that the proper inquiry when faced with a venire member who expresses personal, conscientious, or religious views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. at 424, 105 S.Ct. at 852. In *Wainwright v. Witt,* the Supreme Court also emphasized that considerable deference is to be given the trial court's first-hand evaluation of the potential juror's demeanor and that no particular magical incantation or word choice need necessarily be followed in interrogating the potential juror in this regard. *Id.,* 469 U.S. at 430–35, 105 S.Ct. at 855–58.

The Supreme Court subsequently held that the erroneous dismissal of a potential juror in violation of *Witherspoon* is not subject to harmless error analysis. *Gray v. Mississippi,* 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622 (1987).

More recently, in *Uttecht v. Brown,* —— U.S. ——, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007), the Supreme Court reviewed its *Witherspoon–Witt* line of opinions and identified the following "principles of relevance":

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Uttecht v. Brown,* —— U.S. at ——, 127 S.Ct. at 2224 (citations omitted). The Supreme Court emphasized the critical inquiry for *Witherspoon–Witt* purposes is not whether a state appellate court properly reviewed the propriety of the exclusion but, rather, whether the trial court correctly applied the appropriate federal constitutional standard. *Uttecht v. Brown,* —— U.S. at ——, 127 S.Ct. at 2228. Finally, the Supreme Court admonished reviewing courts to defer to the trial court's resolution of questions of bias arising from a potential juror's conflicting voir dire answers because the trial court had the opportunity to observe the demeanor of the potential juror. *Uttecht v. Brown,* —— U.S. at ——, 127 S.Ct. at 2229–30 ("where, as here there is a lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful voir dire, the trial court has broad discretion."). "Courts reviewing claims of *Witherspoon–Witt* error, however, especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." *Uttecht v. Brown,* —— U.S. at ——, 127 S.Ct. at 2231.

With these principles in mind, this Court turns to the merits of petitioner's *Witherspoon–Witt* claim.

#### 4. Synthesis

█ Both parties have quoted extensively from the voir dire examination of Albert Ernest Lucero in their pleadings in this cause. This Court independently finds Lucero represented the quintessential vacillating juror who appeared intent on conscientiously following the law, as it was explained to him by the prosecution. Lucero tacitly acknowledged his own personal views might call for a more expansive imposition of the death penalty than those allowed by Texas law. In such cases, the Supreme Court has admonished federal habeas courts to defer to the state trial judge's determination of a potential juror's bias based on the trial court's first-hand examination of the potential juror's demeanor. *Uttecht v. Brown,* —— U.S. at ——, 127 S.Ct. at 2229–31; *Wainwright v. Witt,* 469 U.S. at 430–35, 105 S.Ct. at 855–58.

With a single exception,[65] neither party *explicitly* made the appropriate *federal constitutional* inquiry mandated under the Supreme Court's holdings discussed above,

---

**65.** *See* highlighted language on page 721, supra.

i.e., whether Lucero could put aside his personal views regarding the death penalty and answer the capital sentencing special issues based solely on the evidence before him and the law as explained by the trial court. This Court finds Lucero indicated he believed he could put aside his personal views on the death penalty and answer the capital sentencing special issues based on the evidence presented during the trial. This Court concludes Lucero's voir dire answers do not reveal the type of confusion over applicable state-law principles which would "substantially impair" his ability to even-handedly apply or withhold the death penalty.

On the contrary, Lucero's primary confusion appears to have arisen when both the prosecution and defense counsel chose to employ the words "automatic" and "automatically" in their voir dire questions. More specifically, when asked to describe his ability to respond to the first Texas capital sentencing special issue (regarding future dangerousness) when confronted only with a finding of guilt for the offense of capital murder (and presumably no other evidence), Lucero gave conflicting answers regarding whether he would "automatically" vote affirmatively. However, when the words "automatic" and "automatically" were absent from the parties' re-spective inquiries, Lucero effectively communicated that he would base his decision on the first special issue on all the evidence presented during both phases of petitioner's capital trial.

At least some of the responsibility for Lucero's confusion must be borne by counsel for both parties, who asked Lucero a number of ambiguous questions regarding the first special issue which understandably confused Lucero. Whenever counsel for either party avoided use of the words "automatic" and "automatically" in their voir dire questions, Lucero consistently expressed an understanding and willingness to answer the capital sentencing special issues based upon all the evidence presented. Lucero also agreed not to rely exclusively upon the finding of guilt to guide his decision-making during the punishment phase of trial. Both parties' voir dire questioning of Lucero on this point was far from precise. It is perfectly understandable that Lucero was confused at times regarding whether he was being asked if he could keep an open mind about the future dangerousness special issue until he heard all the evidence or whether he was being told he could not answer the future dangerousness special issue affirmatively based solely on the evidence presented during the guilt-innocence phase of trial.[66]

---

66. This Court concludes after an independent review of Lucero's voir dire examination that, when inquiring whether Lucero would "automatically" vote affirmatively on the first Texas capital sentencing special issue, i.e., the inquiry into future dangerousness, counsel for neither party appears to have considered the possibility Lucero was confused over whether he was being asked a question regarding the sufficiency of the evidence to support an affirmative vote on the future dangerousness special issue or whether he was being asked if he could "keep an open mind" about future dangerousness until he had heard all the evidence.

Like any rational layperson, Lucero appears to have instinctively grasped the legal principle long recognized in Texas that "the facts of the offense alone can be sufficient to support an affirmative answer" to the future dangerousness special issue. *See Dewberry v. State*, 4 S.W.3d 735, 741(Tex.Crim.App.1999)("Often the circumstances of the crime provide greater probative evidence of a defendant's probability for committing future acts of violence than any other factor relevant to the future dangerousness special issue."), *cert. denied*, 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000); *Walbey v. State*, 926 S.W.2d 307, 310 (Tex.Crim.App.1996)(holding the facts of the offense alone can support an affirmative answer to the future dangerousness special issue); *Rousseau v. State*, 855 S.W.2d 666, 684–85 (Tex.Crim.App.1993)(holding the

The state trial court's implicit factual determination that Lucero lacked disqualifying bias was an eminently reasonable determination of the facts. Moreover, this Court's independent, *de novo,* review of Lucero's voir dire examination reaches the same conclusion under the *federal constitutional* standard set forth in *Wainwright v. Witt* and recently reiterated in *Uttecht v. Brown.* See *Uttecht v. Brown,* —— U.S. at ——, 127 S.Ct. at 2229–31 (emphasizing the need to defer to the trial court's broad discretion in making implicit factual findings regarding a potential juror's "substantial impairment"); *Patton v. Yount,* 467 U.S. 1025, 1036–37 & n. 12, 104 S.Ct. 2885, 2891 & n. 12, 81 L.Ed.2d 847 (1984) (recognizing that, even in the pre-AEDPA context, while the question of a venire member's disqualification is a mixed question of law and fact, a trial judge's determination regarding a venire member's bias is essentially a factual determination entitled to deference on collateral review); *Beazley v. Johnson,* 242 F.3d 248, 262 (5th Cir.2001) (recognizing a trial judge's finding of bias during voir dire is a determination of fact subject to a presumption of correctness on collateral review), *cert. denied,* 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001). This Court finds nothing erroneous with the state trial court's implicit finding that Lucero possessed no disqualifying bias under applicable federal law.

same), *cert. denied,* 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993); *Allridge v. State,* 850 S.W.2d 471, 488(Tex.Crim.App.1991)(holding the same), *cert. denied,* 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993).

The ambiguous nature of Lucero's questioning by both parties strongly implied that Lucero and his fellow jurors could not vote affirmatively on the future dangerousness special issue based solely on the evidence presented during the guilt-innocence phase of trial. In this regard, counsel for both parties were guilty of misleading Lucero regarding applicable Texas law. As best this Court can

### E. *Conclusions*

Petitioner procedurally defaulted on his *federal constitutional* challenge to the state trial court's failure to grant petitioner's challenge for cause to venire member Lucero. This Court's independent, *de novo,* review of this federal claim yields no basis for federal habeas corpus relief. Regardless of the efforts of counsel for both parties to confuse Lucero, he consistently asserted he was able to set aside his personal views and decide the capital sentencing special issues based solely on the evidence and the law. This is all the Constitution required.

## IV. *Jury Unanimity at the Guilt–Innocence Phase*

### A. *The Claim*

In his second claim herein, petitioner argues his constitutional rights were violated when the trial court refused to instruct the jury at the guilt-innocence phase of petitioner's capital trial that it had to reach a unanimous verdict with regard to the specific manner in which petitioner had committed capital murder (i.e., whether Sophia Martinez's murder occurred during the course of petitioner's commission or attempted commission of a specific predicate felony) before it could render a verdict of "guilty." [67]

tell, Lucero appears to have grasped that, on occasion, the facts of a capital murder may be so heinous as to leave little room for doubt as to the defendant's proclivity for future acts of violence. Thus, when the attorneys for both parties implicitly suggested to Lucero that he and his fellow jurors could not answer the future dangerousness special issue affirmatively based solely on the evidence introduced during the guilt-innocence phase of trial, they were asserting an erroneous legal principle, as well as an argument that offended Lucero's innate common sense.

67. Petition, at pp. 23–26; Petitioner's Reply to Respondent's Answer, filed January 29,

## B. *State Court Disposition*

In his eighth and ninth points of error on direct appeal, petitioner argued the state trial court's refusal to require his jury to return a unanimous verdict with regard to one of more specific theories of capital murder violated both state and federal constitutional principles.[68] The Texas Court of Criminal Appeals rejected the federal constitutional aspect of this argument on the merits. *Berkley v. State*, AP–74,336 (Tex.Crim.App. April 6, 2005), slip op. at pp. 26–29. Petitioner did not re-urge any similar arguments as grounds for relief in his state habeas corpus application.

## C. *No Procedural Default*

■ While respondent correctly points out that petitioner has added citations to a Supreme Court precedent (specifically *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)) in support of petitioner's second claim herein which was not included in petitioner's state appellant's brief, petitioner's belated reliance on the Supreme Court's wholly inapposite holding in *Blakely* does not change the nature of the petitioner's second claim herein to a claim different from the one petitioner's presented in state court. *See Riley v. Cockrell*, 339 F.3d at 318 (the petitioner need not spell out each syllable of the claim before the state court for the claim to have been "fairly presented" and thereby fulfill the exhaustion requirement).

## D. *AEDPA Review*

■ A majority of the Supreme Court rejected the argument implicit in petitioner's second claim herein in *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). In *Schad*, a majority of the Supreme Court recognized the general rule that a single count may include allegations the defendant committed the offense by one or more specified means and held there is no constitutional requirement the jury reach unanimity on the preliminary factual issues which underlie the verdict. *See Schad v. Arizona*, 501 U.S. at 631–32, 111 S.Ct. at 2496–97 (plurality opinion of Justice Souter, Chief Justice Rhenquist, and Justices O'Connor and Kennedy); *Schad v. Arizona*, 501 U.S. at 649–50, 111 S.Ct. at 2506 (Justice Scalia's separate concurring opinion in which he specifically agreed with the plurality's determination the jury need not agree on the mode of commission of a single crime when that offense can be committed in various ways). If, as the Supreme Court majority held in *Schad*, there is no constitutional requirement that a capital murder jury reach unanimity with regard to any of several specific means by which such a crime may be committed when the indictment alleges multiple theories of the offense, then the premise underlying petitioner's argument vanishes. In *Schad*, as occurred in petitioner's case, the prosecution properly indicted petitioner on a single count of capital murder and alleged and attempted to prove several different factual theories by which petitioner could have committed that single offense. *Id.* Hence, petitioner's complaint the guilt-innocence phase jury charge did not instruct his jury to render a "guilty" verdict only if the jury unanimously agreed on one of the three specific theories of the offense alleged in the indictment is *non sequitur*.

The Supreme Court's actual holding in *Schad* refutes, rather than supports, the legal premise underlying petitioner's second claim herein. It is not within the

---

2007, docket entry no. 18 (henceforth "Reply"), at pp. 4–8.

**68.** Appellant's Brief, at pp. 32–39.

province of this Court to either disregard or overrule the Supreme Court majority's clear holding in *Schad.* The state trial court's guilt-innocence phase jury instructions fully complied with clearly established Supreme Court case law as set forth in the actual holding of a majority of that court in *Schad.*

Petitioner's citation to the Supreme Court's holding in *Blakely* does not cast doubt upon the reasonableness of the Texas Court of Criminal Appeals' reliance on the continued vitality of the holding in *Schad.* Nothing in the *Blakely* opinion purports to either overrule the holding in *Schad* or to establish a new rule of constitutional criminal procedure mandating jury unanimity on a particular theory of capital murder where the defendant murdered a single victim while the defendant was engaged simultaneously in the commission or attempted commission of multiple felonies. On the contrary, *Blakely* dealt with the Sixth Amendment requirement that *a jury* make all necessary factual findings required before a criminal sentence may be imposed that is above the statutory range for a particular offense. *Blakely v. Washington,* 542 U.S. at 305, 124 S.Ct. at 2538. Nothing in *Blakely* purports to define the manner in which a jury must determine a capital murder defendant's guilt where a state indictment charges the defendant with a single Count of capital murder allegedly committed in a variety of ways.

This Court has repeatedly addressed and rejected precisely the same argument petitioner presents as his second claim for relief herein. *See Paredes v. Quarterman,* 2007 WL 760230, *18 (W.D.Tex. March 8, 2007) (rejecting ineffective assistance complaint regarding trial counsel's failure to request the same unanimity instruction petitioner requested herein); *Salazar v. Dretke,* 393 F.Supp.2d 451, 486–87 (W.D.Tex.2005) (holding no clearly estab-

lished Supreme Court precedent mandated the unanimity instruction in question and *Teague v. Lane* foreclosed adoption of the same new rule advocated by petitioner herein); *Hinojosa v. Dretke,* 2004 WL 2434353, *18 (W.D.Tex. September 30, 2004) (rejecting the same type of ineffective assistance claim this Court rejected in *Paredes), CoA denied,* 141 Fed.Appx. 395 (5th Cir.2005), *cert. denied,* 547 U.S. 1022, 126 S.Ct. 1569, 164 L.Ed.2d 305 (2006); *Cordova v. Johnson,* 993 F.Supp. 473, 506–07 (W.D.Tex.1998) (holding *Teague v. Lane* foreclosed adoption of the new rule advocated by petitioner herein, i.e., one requiring jury unanimity regarding the method of committing capital murder), *affirmed,* 157 F.3d 380 (5th Cir.1998), *cert. denied,* 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999).

### E. *Teague Foreclosure*

 Furthermore, because the Supreme Court's opinion in *Schad* implicitly, if not explicitly, rejected the legal premise underlying petitioner's second claim herein, adoption of the new rule advocated by petitioner in his second claim herein is foreclosed by the non-retroactivity principle of *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). Under the holding in *Teague,* federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen,* 510 U.S. 383, 389–90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland,* 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997) (holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the

defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

■ The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the non-retroactivity principle. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953.

■ The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland,* 521 U.S. at 157, 117 S.Ct. at 1973. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953. Petitioner's conviction became final for *Teague* purposes not later than July 6, 2005, i.e., the ninety-first day after the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence on direct appeal and the date the deadline for the filing of petitioner's petition for writ of certiorari with the United States Supreme Court expired. *Beard v. Banks,* 542 U.S. 406, 411–12, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004)(recognizing a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."); 28 U.S.C. § 2101(d)(the deadline for filing a certiorari petition from a state criminal conviction shall be established by Supreme Court rule); Sup.Ct. Rule 13.1 (setting the deadline for the filing of a certiorari petition at 90 days from the date of the state court judgment for which review is sought). *Teague* remains applicable after the passage of the AEDPA. *See Horn v. Banks,* 536 U.S. 266, 268–72, 122 S.Ct. 2147, 2148–51, 153 L.Ed.2d 301 (2002)(applying *Teague* in an AEDPA context); *Robertson v. Cockrell,* 325 F.3d 243, 255 (5th Cir.2003)(recognizing the continued vitality of the *Teague* non-retroactivity doctrine under the AEDPA), *cert. denied,* 539 U.S. 979, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003).

■ As of the date petitioner's conviction and sentence became final for *Teague* purposes no federal court had ever held that a Texas capital murder defen-

dant is entitled to a jury instruction directing a unanimous verdict with regard to the specific manner in which the defendant committed capital murder. Nor was such a holding arguably discernable based on any then-existing Supreme Court precedent. Thus, petitioner's second claim herein is foreclosed by the non-retroactivity doctrine of *Teague.* The new rule proposed by petitioner herein falls within neither of the recognized exceptions to the *Teague* doctrine. Even assuming that a federal court might one day rule that a capital murder defendant is entitled to separate submission (and a unanimous verdict) with regard to each theory of capital murder charged in a single Count of capital murder, no such authority existed at the time petitioner's conviction became final for *Teague* purposes.

### F. Conclusions

Petitioner did not procedurally default on his second claim herein. The Supreme Court majority's holding in *Schad v. Arizona* does not require a jury to agree unanimously on a specific factual theory of capital murder before returning a "guilty" verdict. The non-retroactivity doctrine of *Teague v. Lane* precludes adoption of the new rule of federal constitutional criminal procedure urged by petitioner in his second claim in this federal habeas corpus proceeding. *Salazar v. Dretke,* 393 F.Supp.2d at 487.

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's complaint regarding the lack of a unanimity directive in petitioner's guilt-innocence phase jury instructions was neither contrary to, nor involved an unreasonable ap-

plication of, clearly established federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal.

## V. Lesser–Included Offense Instruction on Murder

### A. The Claim

In his third claim herein petitioner argues the trial court erred in failing *sua sponte* to instruct the jury at the guilt-innocence phase of petitioner's capital murder trial regarding the lesser-included offense of noncapital murder and this failure violated petitioner's rights under the Supreme Court's holding in *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).[69]

### B. State Court Disposition

While petitioner requested and received jury instructions at the guilt-innocence phase of his capital trial on the lesser-included offenses of robbery, kidnaping, aggravated sexual assault, and criminally negligent homicide,[70] petitioner failed to request a lesser-included offense instruction on murder be included in his guilt-innocence phase jury charge.[71] Petitioner included no point of error in his appellant's brief on direct appeal complaining about the absence of a lesser-included offense instruction on murder from his guilt-innocence phase jury charge. Likewise, petitioner failed to include such a claim in his state habeas corpus application.

---

**69.** Petition, at pp. 26–34; Reply, at pp. 8–13.

**70.** S.F. Trial, Volume 71, at pp. 162–75; Trial Transcript, Volume II, at pp. 502–17.

**71.** Petitioner made no request for a lesser-included offense instruction on noncapital murder and raised no objection during his guilt-innocence phase charge conference regarding the absence of such an instruction. S.F. Trial, Volume 71, at pp. 134–40.

### C. AEDPA's Foreclosure of Relief on Unexhausted Claims

Respondent correctly points out petitioner has never presented this argument to the Texas Court of Criminal Appeals, either as a point of error on direct appeal or as a ground for relief in a state habeas corpus application. Respondent also correctly points out petitioner failed to request such a lesser-included offense instruction and failed to make a contemporaneous objection to the state trial court's failure to include a lesser-included offense instruction on murder as a part of petitioner's guilt-innocence phase jury charge. Respondent argues petitioner has procedurally defaulted on this unexhausted claim.

Petitioner responds with a novel argument suggesting that because he was procedurally barred under applicable state law procedural principles from asserting this same complaint for the first time on state direct appeal (due to his failure to comply with the Texas contemporaneous objection rule), he can circumvent the federal doctrine of procedural default on his undisputedly unexhausted third claim herein. Petitioner argues further that, by committing not one, but two, separate violations of state procedural rules, he has effectively trumped the *federal* doctrine of procedural default and utterly eviscerated the principles of comity and federalism which underlie the *federal* exhaustion doctrine. In essence, petitioner proposes an expansion of the Fifth Circuit's "futility" exception to the *federal* exhaustion doctrine that would effectively swallow the rule. Not surprisingly, petitioner cites no Supreme Court or Circuit Court authority to support his novel effort to circumvent the authorities discussed at length in Section III.C.3. above.

Equally unsurprising is the fact none of the authorities cited by petitioner support his effort to do an end-run around the federal exhaustion and procedural default doctrines. Contrary to petitioner's suggestion, the footnote in *Lynce v. Mathis,* 519 U.S. 433, 436 n. 4, 117 S.Ct. 891, 893 n. 4, 137 L.Ed.2d 63 (1997), merely recites that, in that case, the State failed to raise a defense at any level of the federal system based on the petitioner's failure to exhaust available state remedies on his unexhausted claim. Nothing in *Lynce,* a pre-AEDPA case, casts any doubt on the continued vitality of the *federal* exhaustion doctrine or recognizes a "futility" exception to either that doctrine or the *federal* procedural default doctrine.

Likewise, petitioner mistakenly relies on the Fifth Circuit's opinion in *Fisher v. Texas,* 169 F.3d 295, 302–03 (5th Cir.1999)(declining to dismiss an unexhausted claim on that basis where the petitioner had presented a very similar claim to the state habeas court, the State failed to raise lack of exhaustion as a defense at the District Court level, the state courts had recently rejected *the merits* of the underlying claim, and the claim was barred by the non-retroactivity doctrine of *Teague v. Lane* ). This Court agrees it would have been "futile" as a matter of *state procedural law* for petitioner to have presented his complaint about the absence of a lesser-included offense instruction on murder to the state courts on direct appeal or in a state habeas application. Petitioner neither requested such an instruction nor raised a timely objection to the absence of same in his guilt-innocence phase jury charge. *See Kinnamon v. State,* 791 S.W.2d 84, 96 (Tex.Crim.App. 1990)("Even where a lesser included offense is supported by the evidence, the failure of defense counsel to request a charge on the offense or properly object to its omission constitutes a waiver."), *overruled on other grounds, Cook v. State,* 884

S.W.2d 485, 488–92 (Tex.Crim.App.1994). However, that fact alone does not end this Court's procedural default inquiry.

In *Fisher,* the Fifth Circuit held it would have been "futile" for a federal habeas petitioner to have exhausted available state remedies on a *Batson* claim premised on the exclusion of venire members based on their religious affiliation because the state courts had already rejected the merits of precisely such a constitutional claim. *Fisher v. Texas,* 169 F.3d at 303("The futility exception applies when, as here, the highest state court has recently decided the same legal question adversely to the petitioner."). In contrast, the Texas Court of Criminal Appeals' opinion in *Kinnamon,* which petitioner relies upon for support of his own "futility" argument, did not address *the merits* of any federal constitutional claim. Instead, the Texas Court of Criminal Appeals' opinion in *Kinnamon* merely applied a long-standing state *procedural* rule barring appellate consideration of a complaint about an absent lesser-included offense instruction where the defendant failed to either request such an instruction or object to the absence of same. *Kinnamon v. State,* 791 S.W.2d at 96. Petitioner has not identified any Texas Court of Criminal Appeals' opinion rejecting *the merits* of a *Beck* claim under circumstances similar to those at petitioner's trial. Petitioner's failure to comply with the long-standing Texas contemporaneous objection rule, and not any pre-existing ruling *on the merits* by the Texas Court of Criminal Appeals, rendered petitioner's *Beck* claim *procedurally defaulted* under applicable state procedural rules. The type of "futility" present in *Fisher* is wholly absent from petitioner's case.

Petitioner fails to recognize that, since the enactment of the AEDPA, all federal habeas courts are *statutorily* precluded from granting federal habeas relief on unexhausted claims. Under the AEDPA, federal courts lack the power to grant habeas corpus relief on unexhausted claims. *Kunkle v. Dretke,* 352 F.3d at 988 ("28 U.S.C. § 2254(b)(1) requires that federal habeas petitioners fully exhaust remedies available in state court before proceeding in federal court."); *Riley v. Cockrell,* 339 F.3d at 318; *Anderson v. Johnson,* 338 F.3d at 386; *Henry v. Cockrell,* 327 F.3d at 432 ("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."); *Mercadel v. Cain,* 179 F.3d at 276–77; *Alexander v. Johnson,* 163 F.3d at 908; *Jones v. Jones,* 163 F.3d at 299.

Petitioner's complaint that his guilt-innocence phase jury charge did not include a lesser-included offense instruction on murder was never preserved for state appellate review because petitioner voiced no timely request nor a timely objection during his trial court proceedings. Likewise, petitioner has never presented this complaint to any state appellate court, either in a direct appeal or a state habeas corpus proceeding. The AEDPA prohibits a federal habeas court from *granting* relief on an unexhausted claim unless circumstances exist which render available State corrective processes ineffective to protect the petitioner's federal constitutional rights. 28 U.S.C. § 2254(b)(1). Petitioner has alleged no facts showing there was any defect in the state direct appeal or state habeas corpus processes available to petitioner which rendered those processes ineffective or inadequate to protect petitioner's constitutional rights recognized in *Beck* and its progeny.

Petitioner has identified no authority recognizing a "futility" exception to the AEDPA's *statutory* barrier to federal habeas relief premised on an unexhausted

claim which was procedurally defaulted under applicable state procedural rules; nor has this Court's independent research disclosed such a rule. This Court is *statutorily* precluded from granting federal habeas relief on petitioner's unexhausted third claim herein. *Id.*

### D. *No Merits*

However, Title 28 U.S.C. § 2254(b)(2) empowers a federal habeas court to deny an exhausted claim on the merits. *See Miller v. Dretke,* 431 F.3d 241, 245 (5th Cir.2005)(holding a federal habeas court may deny, but not grant, a non-exhausted claim), *cert. denied,* —— U.S. ——, 127 S.Ct. 353, 166 L.Ed.2d 65 (2006); *Neville v. Dretke,* 423 F.3d 474, 482 (5th Cir.2005)(holding it was within the discretion of the district court to deny the petitioner's unexhausted ineffective assistance claim on the merits); *Smith v. Cockrell,* 311 F.3d at 684 (holding even when a claim is unexhausted and procedurally defaulted, the federal courts may deny the claim on the merits).

Petitioner's *Beck* claim lacks even arguable merit under clearly established Supreme Court precedent. In *Beck,* the Supreme Court struck down on due process grounds a state statute which forbid the submission of any lesser-included offense instructions in a capital trial. *Beck v. Alabama,* 447 U.S. at 637–43, 100 S.Ct. at 2389–92. The Supreme Court subsequently held due process requires that a lesser-included offense instruction be given *only* when the evidence warrants such an instruction. *Hopper v. Evans,* 456 U.S. 605, 611–12, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982). The Supreme Court has also held the central concern of *Beck,* i.e., eliminating the distorting effects on the factfinding process of an all-or-nothing decision on guilt for capital murder, is *not* implicated where the jury is faced with a realistic option, i.e., one supported by the evidence, of convicting the defendant of a noncapital offense. *Schad v. Arizona,* 501 U.S. at 646–48, 111 S.Ct. at 2505.

▐ The state trial court instructed petitioner's jury at the guilt-innocence phase of trial on no less than four lesser-included, noncapital, offenses, to wit, robbery, kidnaping, aggravated sexual assault, and criminally negligent homicide. The evidence presented during the guilt-innocence phase of trial, particularly petitioner's written statements to the police, fully permitted a rational jury to convict petitioner on any or all of these lesser-included offenses. For instance, petitioner's jury was free to believe petitioner's repeated assertions that his fatal shooting of "the girl" was a wholly accidental reaction on his part to her efforts to entice petitioner into renewed sexual relations. This was evidence from which a rational jury could have convicted petitioner of criminally negligent homicide. Therefore, the "central concern" of *Beck* was not present during the guilt-innocence phase of petitioner's trial. *See Montoya v. Collins,* 955 F.2d 279, 285–86 (5th Cir.1992)(holding capital murder defendant was not entitled to a jury instruction on involuntary manslaughter where jury was instructed on the lesser-included offense of criminally negligent homicide), *cert. denied.* 506 U.S. 1036, 113 S.Ct. 820, 121 L.Ed.2d 692 (1992). The Supreme Court has made clear that a capital murder defendant is *not* entitled to have his jury instructed on *every* lesser included noncapital offense supported by the evidence. *See Schad v. Arizona,* 501 U.S. at 645–48, 111 S.Ct. at 2504–05 (holding a capital defendant whose jury was instructed on the noncapital, lesser-included, offense of noncapital murder was *not* constitutionally entitled to a jury instruction on the lesser-included offense of robbery).

The Fifth Circuit has repeatedly rejected *Beck* claims where the jury was presented with the choice of convicting the defendant of a noncapital offense supported by the evidence. *See, e.g., Pippin v. Dretke,* 434 F.3d 782, 791 (5th Cir.2005)(capital murder defendant had no constitutional right to a jury instruction on felony murder where the jury was instructed on the lesser-included offense of aggravated kidnaping), *cert. denied,* —— U.S. ——, 127 S.Ct. 351, 166 L.Ed.2d 49 (2006); *Livingston v. Johnson,* 107 F.3d 297, 312–13 (5th Cir.1997)(capital murder defendant had no constitutional right to jury instruction on felony murder where jury was instructed on lesser-included offense of noncapital murder), *cert. denied,* 522 U.S. 880, 118 S.Ct. 204, 139 L.Ed.2d 141 (1997); *Allridge v. Scott,* 41 F.3d 213, 218–20 (5th Cir.1994)(capital murder defendant not entitled to jury instruction on felony murder whether jury was instructed on the lesser-included offense of noncapital murder), *cert. denied,* 514 U.S. 1108, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995); *Montoya v. Collins,* 955 F.2d at 285–86 (capital murder defendant was not entitled to a jury instruction on involuntary manslaughter where jury was instructed on the lesser-included offense of criminally negligent homicide).

■■■■ A capital defendant is constitutionally entitled to an instruction on a lesser-included offense if the evidence would permit a jury *rationally* to find the defendant guilty of the lesser offense and acquit him of the greater. *See Schad v. Arizona,* 501 U.S. at 646–48, 111 S.Ct. at 2505 (holding the central concern of *Beck* is not implicated when the jury is given the opportunity to convict the defendant of a noncapital offense provided there is evidence in the record from which the jury can *rationally* convict the defendant of only the lesser-included offense); *Hopper*

*v. Evans,* 456 U.S. at 611–12, 102 S.Ct. at 2053 (holding due process requires a lesser-included offense instruction be given *only* when the evidence warrants such an instruction). Due process requires a jury charge on a lesser-included offense when the evidence "unquestionably establishes" the defendant is guilty of a serious, violent offense but leaves some doubt with respect to an element that would justify conviction of a capital offense. *Pippin v. Dretke,* 434 F.3d at 791; *Aguilar v. Dretke,* 428 F.3d 526, 531 (5th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 2059, 164 L.Ed.2d 793 (2006). A defendant is entitled to the instruction if the jury could rationally acquit the defendant on the capital crime and convict on the noncapital crime. *Aguilar v. Dretke,* 428 F.3d at 531; *Jones v. Johnson,* 171 F.3d 270, 274 (5th Cir.1999), *cert. denied,* 527 U.S. 1059, 120 S.Ct. 29, 144 L.Ed.2d 832 (1999); *Ransom v. Johnson,* 126 F.3d 716, 724–25 (5th Cir.1997), *cert. denied,* 522 U.S. 944, 118 S.Ct. 361, 139 L.Ed.2d 281 (1997); *Cordova v. Lynaugh,* 838 F.2d 764, 767 (5th Cir.1988), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 932 (1988).

This inquiry necessarily requires careful review of the elements of each offense and other applicable provisions of state law. *See Livingston v. Johnson,* 107 F.3d 297, 312–13 (5th Cir.1997)(analyzing the difference under Texas law between felony murder and capital murder in the course of rejecting a *Beck* claim), *cert. denied,* 522 U.S. 880, 118 S.Ct. 204, 139 L.Ed.2d 141 (1997); *East v. Scott,* 55 F.3d 996, 1005–06 (5th Cir.1995)(examining the distinction under Texas between murder and felony murder, as well as the impact under Texas of evidence of voluntary intoxication, in analyzing a *Beck* claim); *Cordova v. Lynaugh,* 838 F.2d at 768–70 (analyzing the distinction under Texas law between capital murder and murder, as well as the

Texas law of parties, while granting federal habeas relief based on *Beck* error).

■■■ Petitioner argues his trial court should have *sua sponte* instructed petitioner's jury on the lesser-included offense of noncapital murder. At all times relevant to petitioner's offense and trial, Texas law provided in pertinent part that a person commits an offense if he intentionally or knowingly causes the death of an individual. Tex. Pen.Code Ann. § 19.02(b)(1)(Vernon 2003). Thus, in order to convict him of noncapital murder under applicable Texas law, petitioner's jury would have had to find beyond a reasonable doubt that petitioner intentionally caused Sophia Martinez's death. The *multiple* fatal gunshot wounds to Sophia's face and the close-range nature of at least one of those fatal shots fully supported a rational finding of *intentional* murder. However, this fact alone does not end this Court's inquiry under *Beck* and its progeny. The relevant test is not merely whether the jury could *rationally* convict the defendant of the lesser-included offense but whether the jury could also rationally acquit the defendant on the capital crime. *Schad v. Arizona*, 501 U.S. at 646–48, 111 S.Ct. at 2505; *Aguilar v. Dretke*, 428 F.3d at 531; *Jones v. Johnson*, 171 F.3d at 274; *Ransom v. Johnson*, 126 F.3d at 724–25; *Cordova v. Lynaugh*, 838 F.2d at 767.

Petitioner was charged with having intentionally caused Sophia's death *while in the course of committing and attempting to commit* several predicate felonies, i.e., robbery, kidnaping, and aggravated sexual assault. The state trial court correctly instructed petitioner's jury that Texas law provides the offense of "kidnaping" occurs when a person intentionally or knowingly "abducts" another person and the term "abduct" means to restrain a person with

intent to prevent his or her liberation by using or threatening deadly force or by secreting or holding the victim in a place where the victim is unlikely to be found.[72] *Tex. Pen.Code Ann.* §§ 20.01(2) & 20.03(a) (Vernon 2003). The state trial court also correctly instructed petitioner's jury that, as used in the context of kidnaping, Texas law provides the term "restrain" means "to restrict a person's movements without consent, so as to interfere substantially with that person's liberty, by moving the person from one place to another or by confining the person" and "restraint is without consent if it is accomplished by force, intimidation, or deception."[73] *Tex. Pen Code Ann.* § 20.01(1)(A) (Vernon 2003). Under Texas law, the term "in the course of" has been construed to mean conduct occurring "in an attempt to commit, during the commission, or in immediate flight after an attempt or actual commission" of the predicate felony. *Green v. Johnson*, 160 F.3d 1029, 1036 n. 5 (5th Cir.1998), *cert. denied*, 525 U.S. 1174, 119 S.Ct. 1107, 143 L.Ed.2d 106 (1999); *Mann v. Scott*, 41 F.3d 968, 977 (5th Cir.1994), *cert. denied*, 514 U.S. 1117, 115 S.Ct. 1977, 131 L.Ed.2d 865 (1995).

The question remaining before this Court is whether a rational jury could have found petitioner was *not* "in the course of committing or attempting to commit" Sophia Martinez's kidnaping at the time petitioner intentionally shot her multiple times in the face. *See Mann v. Scott*, 41 F.3d at 977(holding the relevant inquiry was whether the defendant in that case had "completed" the offense of theft at the time he murdered his victim).

There was no evidence before the jury at the guilt-innocence phase of petitioner's capital trial from which a rational jury

**72.** Trial Transcript, Volume II, at p. 506.

**73.** Trial Transcript, Volume II, at pp. 506–07.

could have concluded petitioner was guilty *only* of noncapital murder. Moreover, petitioner has alleged no *rational* factual theory suggesting he was guilty *only* of the lesser-included offense of noncapital murder. Petitioner's written statements to police establish beyond any doubt that he fatally shot "the girl" only *after* he directed her at gunpoint to drive her vehicle away from the ATM to an isolated location. It was clear the petitioner had employed force or at least the threat of force to "abduct" and "restrain" Sophia Martinez. Petitioner admitted he either directed her at gunpoint to drive to an isolated location or directed her at gunpoint to permit him to drive her vehicle to that location. Thus, petitioner admitted he employed deadly force or threats of deadly force to substantially interfere with Sophia's liberty by moving her from place to place.

There was no evidence before the jury at the guilt-innocence phase of petitioner's trial from which a rational jury could have concluded the petitioner had released Sophia or otherwise ceased to "restrain" her at the time he fatally shot her. On the contrary, petitioner's written statements to police disclose he continued to direct her movements once they arrived at the isolated location where he alleges she initiated what he described as consensual sexual relations.[74] To convict petitioner of noncapital murder under these circumstances, petitioner's jury would have had to disregard the undisputed evidence establishing the petitioner had kidnaped Sophia Martinez and was continuing to substantially interfere with her liberty through the use or threat of deadly force at the time he fatally shot her. There was no evidence

from which a rational jury could have concluded petitioner's kidnaping of Sophia Martinez had "concluded" before he fatally shot her. Petitioner admits he continued to direct Sophia to exit and enter her vehicle and continued to hold her at gunpoint until the instant he fatally shot her. Thus, no rational jury could have concluded petitioner was guilty exclusively of a noncapital murder committed separately and distinctly from petitioner's unlawful abduction and restraint of Sophia Martinez.

Therefore, petitioner was not entitled to the submission of a jury instruction on the lesser-included offense of noncapital murder. Petitioner's *Beck* claim is without arguable merit.

### E. Conclusions

Because petitioner's third claim herein is unexhausted, this Court is statutorily precluded from granting federal habeas relief based on same. Petitioner procedurally defaulted under applicable state law on his *Beck* claim herein by failing to contemporaneously object to the absence of a lesser-included offense instruction on noncapital murder from his guilt-innocence phase jury charge. Finally, there is no arguable merit to petitioner's *Beck* claim because no rational jury could have found petitioner intentionally murdered Sophia Martinez while petitioner was not in the course of committing or attempting to commit Sophia's kidnaping.

### VI. Ring and Apprendi Claim

### A. The Claim

In his fourth claim herein, petitioner argues the state trial court violated his

---

**74.** This Court expresses grave reservations regarding whether a rational jury could have found Sophia Martinez was capable of consenting to engage in sexual relations with petitioner after the petitioner shot her once in the face, she began bleeding profusely from the nose, and the petitioner drove her at gunpoint to an isolated location in the middle of the night. Under Texas law, restraint is "without consent" if it is accomplished by force, intimidation, or deception. Tex. Pen. Code Ann. § 20.01(1)(A) (Vernon 2003).

Sixth Amendment rights recognized in the Supreme Court's opinions in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), when the trial court refused his requests to impose a "beyond a reasonable doubt" burden of proof on the prosecution in connection with the Texas capital sentencing scheme's mitigation special issue.[75]

## B. *State Court Disposition*

Petitioner fairly presented substantially the same arguments to the Texas Court of Criminal Appeals as his eleventh point of error on direct appeal.[76] The Texas Court of criminal Appeals rejected these arguments on the merits. *Berkley v. State*, AP–74,336 (Tex.Crim.App. April 6, 2005), slip op. at p. 30. Petitioner did not re-urge any similar arguments as grounds for relief in his state habeas corpus application.

## C. *AEDPA Review*

In *Apprendi v. New Jersey*, *supra*, the Supreme Court struck down on due process and jury trial grounds a state scheme which permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing range for the offense by a factor of one hundred percent. *Apprendi*, 530 U.S. at 497, 120 S.Ct. at 2366. The Supreme Court's opinion in *Apprendi* emphasized it was merely extending to the

state courts the same principles discussed in Justice Stevens' and Justice Scalia's concurring opinions in *Jones v. United States*, 526 U.S. 227, 252–53, 119 S.Ct. 1215, 1228–29, 143 L.Ed.2d 311 (1999): other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–63. Put more simply, the Supreme Court held (1) it was unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal is exposed and (2) all such findings must be established beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2363.

Two years later, in *Ring v. Arizona, supra*, the Supreme court applied the holding and its reasoning in *Apprendi* to strike down a death sentence in a case in which the jury had declined to find the defendant guilty of pre-meditated murder during the guilt-innocence phase of a capital trial (instead finding the defendant guilty only of felony murder) but a trial judge subsequently concluded the defendant should be sentenced to death based upon *factual* determinations that (1) the offense was committed in expectation of receiving something of pecuniary value (i.e., the fatal shooting of an armored van guard during a robbery) and (2) the foregoing aggravating factor out-weighed the lone mitigating factor favoring a life sentence (i.e., the defendant's minimal criminal record).[77] *Ring*,

---

75. Petition, at p. 35; Reply, at pp. 13–15.

76. Appellant's Brief, at pp. 46–52.

77. In point of fact, the Arizona trial judge found a second aggravating factor applied in *Ring's* case, i.e., Ring's comments after the fatal shooting in which he chastised his co-

conspirators for their failure to praise Ring's marksmanship rendered his offense "especially heinous, cruel, or depraved." The Arizona Supreme Court later held there was insufficient evidence to support the trial judge's finding of depravity but nonetheless reweighed the remaining aggravating factor

536 U.S. at 609, 122 S.Ct. at 2443. The Supreme Court emphasized, as it had in *Apprendi*, the dispositive question "is not one of form, but of effect": "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439. "A defendant may not be exposed to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439–40, *quoting Apprendi*, 530 U.S. at 483, 120 S.Ct. at 2359. Because Ring would not have been subject to the death penalty but for the trial judge's factual determination as to the existence of an aggravating factor, the Supreme Court declared Ring's death sentence violated the right to trial by jury protected by the Sixth Amendment. *Ring*, 536 U.S. at 609, 122 S.Ct. at 2443.

▪ At the punishment phase of petitioner's capital trial, the jury was faced with two special issues: the first inquired whether the prosecution had established *beyond a reasonable doubt* that a probability existed the petitioner would commit criminal acts of violence constituting a continuing threat to society; and the second inquired whether, without any express or implicit burden of proof assigned, the mitigating evidence warranted a sentence of less than death.[78] This submission was consistent with Section 2 of Article 37.071 of the Texas Code of Criminal Procedure, which mandates the state carry the burden of proving the defendant's future dangerousness "beyond a reasonable doubt," but imposes no similar burden of proof re-

quirement for the *Penry* or mitigation special issue.

Petitioner's argument in support of his fourth claim herein equates his jury's negative answer to the *Penry* or mitigation special issue included in the Texas capital sentencing scheme with the Arizona trial judge's factual findings regarding the existence of aggravated factors in *Ring*. However, petitioner misperceives the true nature of the Texas capital sentencing scheme.

The Supreme Court explained in *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), that the Eighth Amendment addresses two different but related aspects of capital sentencing: the eligibility decision and the selection decision. *Tuilaepa*, 512 U.S. at 971, 114 S.Ct. at 2634. The Supreme Court's analysis of those two aspects of capital sentencing provides a comprehensive system for analyzing Eighth Amendment claims:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravated circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only

---

against the lone mitigating factor and affirmed Ring's death sentence. *Ring v. Arizona*, 536 U.S. at 595–96, 122 S.Ct. at 2435–36.

78. Trial Transcript, Volume II, at pp. 536–43; S.F. Trial, Volume 74, at pp. 189–96.

to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague. * * *

We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Tuilaepa*, 512 U.S. at 971–73, 114 S.Ct. at 2634–35 (citations omitted).

The Supreme Court clearly pronounced in *Tuilaepa* that States may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa*, 512 U.S. at 974, 114 S.Ct. at 2636. The Supreme Court held further, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa*, 512 U.S. at 978, 114 S.Ct. at 2638.

In *Loving v. United States*, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996), the Supreme Court discussed the first part of the *Tuilaepa* analysis, i.e., the eligibility decision, as follows:

The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Loving*, 517 U.S. at 755, 116 S.Ct. at 1742 (citations omitted).[79]

The Arizona capital sentencing scheme the Supreme Court addressed in *Ring* relied upon a trial judge's factual findings of "aggravating" factors and directed the trial judge to weigh those aggravating factors against any mitigating factors found to apply to the defendant. Thus the Arizona trial judge's factual findings in *Ring* were part of the constitutionally-mandated eligibility determination, i.e., the narrowing function.

In contrast, the Texas capital sentencing scheme under which petitioner was tried, convicted, and sentenced performed the constitutionally-required narrowing function discussed in *Tuilaepa* and *Loving* at the guilt-innocence phase of petitioner's trial and further narrowed the category of those eligible for the death penalty by requiring a finding, beyond a reasonable doubt, of future dangerousness. *See Son-*

**79.** The Supreme Court subsequently elaborated on the distinction between the narrowing function or eligibility decision and the selection phase of a capital sentencing proceeding in *Buchanan v. Angelone*, 522 U.S. 269, 275–77, 118 S.Ct. 757, 761–62, 139 L.Ed.2d 702 (1998).

*nier v. Quarterman,* 476 F.3d 349, 365–67 (5th Cir.2007)(recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh,* —— U.S. ——, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), performs the constitutionally-required narrowing function through its statutory definition of capital murder and further narrows the category of those eligible for the death penalty by requiring an additional fact finding, beyond a reasonable doubt, that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society), *cert. filed June 5, 2007 (no. 06–11804).*

Unlike Arizona's weighing scheme, the Texas capital sentencing scheme performs the constitutionally-mandated narrowing function, i.e., the process of making the "eligibility decision," at the guilt-innocence phase of a capital trial by virtue of the manner with which Texas defines the offense of capital murder in Section 19.03 of the Texas Penal Code. See *Johnson v. Texas,* 509 U.S. at 362, 113 S.Ct. at 2666(holding that its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifications of murder for that purpose); *Lowenfield v. Phelps,* 484 U.S. 231, 243–47, 108 S.Ct. 546, 554–55, 98 L.Ed.2d 568 (1988)(comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek v. Texas,* 428 U.S. 262, 268–75, 96 S.Ct. 2950, 2955–57, 49 L.Ed.2d 929 (1976)(*plurality opinion* recognizing the Texas capital sentencing scheme narrows the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory

schemes which require proof of aggravating circumstances to justify the imposition of the death penalty).

The Texas capital sentencing scheme under which petitioner was convicted and sentenced involved a significantly different approach to capital sentencing than the Arizona scheme involved in *Ring.* By virtue of (1) its guilt-innocence phase determination *beyond a reasonable doubt* that the petitioner committed *capital* murder, as defined by applicable Texas law, and (2) its factual finding of future dangerousness, also made *beyond a reasonable doubt,* petitioner's jury found *beyond a reasonable doubt* the petitioner was *eligible* to receive the death penalty. *Sonnier v. Quarterman,* 476 F.3d at 365–67. In contrast, *Ring's* jury made no analogous factual findings. Instead, *Ring's* Arizona jury found beyond a reasonable doubt only that *Ring* was guilty of "felony murder," a wholly separate offense from the offense of capital murder as defined under Texas law.

The petitioner's first capital sentencing special issue, i.e., the future dangerousness issue, included a "beyond a reasonable doubt" burden of proof squarely placed on the prosecution. Petitioner's jury's factual finding on the future dangerousness special issue was an essential part of the procedural process under Texas law for determining whether the petitioner was *eligible* to receive the death penalty.

In contrast, the *Penry* or "mitigation" special issue employed at the punishment phase of petitioner's capital trial was designed to address the second aspect of capital sentencing discussed in *Tuilaepa,* i.e., the constitutional requirement that the jury be given an opportunity "to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v.*

*Marsh,* —— U.S. at ——, 126 S.Ct. at 2524–25; *Sonnier v. Quarterman,* 476 F.3d at 365. "The use of mitigation evidence is a product of the requirement of individualized sentencing." *Kansas v. Marsh,* —— U.S. at ——, 126 S.Ct. at 2525.

The Supreme Court has distinguished the constitutional requirements of the *eligibility* decision, i.e., the narrowing function, and the *selection* decision, i.e., the individualized assessment of mitigating circumstances, holding the latter requires only that the sentencing jury be given broad range to consider all relevant mitigating evidence but leaving to the States wide discretion on how to channel the sentencing jury's balancing of mitigating and aggravating factors. *See Kansas v. Marsh,* —— U.S. at ——, 126 S.Ct. at 2525 (holding, in connection with the selection phase of a capital sentencing proceeding, the Constitution mandates only that (1) the defendant has a right to present the sentencing authority with information relevant to the sentencing decision and (2) the sentencing authority is obligated to consider that information in determining the appropriate sentence); *Tuilaepa,* 512 U.S. at 978, 114 S.Ct. at 2638 (holding, at the selection stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment.").

At the *selection* phase of a capital trial, the Supreme Court has left to the States the decision whether to channel a sentencing jury's weighing of mitigating evidence or grant the jury unfettered discretion to consider all relevant mitigating evidence and weigh same in any manner the jury deems reasonable. *See Kansas v. Marsh,*

—— U.S. ——, 126 S.Ct. at 2525, 165 L.Ed.2d 429 ("So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed."). Likewise, the Supreme Court has not yet imposed a particular burden of proof requirement with regard to a capital sentencing jury's consideration of mitigating evidence when such consideration occurs exclusively within the selection process.

"[D]iscretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has been found that the defendant is a member of the class made eligible for that penalty."

*Tuilaepa,* 512 U.S. at 979, 114 S.Ct. at 2639 (citations omitted).

■■■ "[T]here is no constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Johnson v. Texas,* 509 U.S. at 362, 113 S.Ct. at 2666(*quoting Boyde v. California,* 494 U.S. at 377, 110 S.Ct. at 1196). "We have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally re-

quired." *Kansas v. Marsh,* —— U.S. at ——, 126 S.Ct. at 2525.

As explained above, the "eligibility" decision required by the Constitution is satisfied under Texas law by the jury's findings "beyond a reasonable doubt" that (1) the defendant is guilty of capital murder as defined under Section 19.03 of the Texas Penal Code and (2) there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society. *Sonnier v. Quarterman,* 476 F.3d at 365–67. This is all the Constitution requires to satisfy the concerns discussed by the Supreme Court in *Ring.*

Consistent with the Supreme Court's holdings in *Kansas v. Marsh, Tuilaepa v. California,* and *Johnson v. Texas,* a Texas capital sentencing jury may be granted "unfettered discretion" regarding how it should weigh the mitigating evidence, if any, relevant to a particular defendant's background and character against the aggravating circumstances of the defendant's offense and the defendant's demonstrated propensity for future dangerousness. Thus, the Texas Legislature's decision not to assign a particular burden of proof on either party in connection with the Texas capital sentencing scheme's *Penry* or mitigation special issue falls well within the broad range of discretionary authority a State may exercise in connection with the selection phase of a capital trial.[80]

The Arizona trial judge's affirmative factual finding regarding the existence of an aggravating factor made in *Ring* did not serve the same constitutionally-mandated purpose as the jury's negative answer to the *Penry* special issue made at

petitioner's Texas capital murder trial. The Arizona trial judge's factual findings were designed to satisfy the "eligibility" requirement discussed in *Tuilaepa.* In jurisdictions such as Texas (where the "eligibility" decision discussed in *Tuilaepa* is made at the guilt-innocence phase of a capital trial) the only factual issues before the jury at the punishment phase of a capital trial address only the "selection" decision identified by the Supreme Court in *Tuilaepa.* Even if Texas' future dangerousness special issue could be construed as falling within the scope of the constitutionally-mandated eligibility decision, Texas law clearly places the burden of proving same beyond a reasonable doubt on the prosecution.

Thus, the procedural requirements applicable to the *eligibility* decision in weighing jurisdictions such as Arizona (where specific findings of aggravating factors are made during a separate post-conviction proceeding and then weighed against any "mitigating" factors also found by the sentencing authority) are inapplicable to a Texas capital sentencing jury's *selection* decision, i.e., its determination as to whether the mitigating evidence in a particular case warrants a sentence of less than death for a criminal defendant who has already been convicted beyond a reasonable doubt of capital murder and already determined beyond a reasonable doubt to pose a risk of future dangerousness. *See Scheanette v. Quarterman,* 482 F.3d 815, 828 (5th Cir.2007) ("a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death."); *Sonnier v. Quarterman,* 476 F.3d at 363–67 (holding the deletion of the

---

**80.** It can be argued the absence of a burden of proof standard in the *Penry* or mitigation special issue could be reasonably expected to ensure to the benefit of defendants because a shrewd defense counsel could argue the absence of an instruction mandating a particu-

lar burden of proof on this special issue permits the jury to answer the *Penry* special issue affirmatively if the jury concludes there is only a scintilla of evidence supporting an affirmative finding on that special issue.

former special issue inquiring into whether the defendant acted "deliberately" in connection with the capital murder from the Texas capital sentencing scheme did not render same vulnerable to attack on Eighth Amendment grounds); *Granados v. Quarterman,* 455 F.3d 529, 537 (5th Cir.2006) (distinguishing *Ring* and *Apprendi* on the ground a jury's affirmative answer to the Texas capital sentencing scheme's *Penry* or "mitigation" special issue reduces a sentence from death rather than increasing it to death, as was the case with the factual findings made by the trial judges in *Apprendi* and *Ring* ), *cert. denied,* —— U.S. ——, 127 S.Ct. 732, 166 L.Ed.2d 568 (2006); *Rowell v. Dretke,* 398 F.3d 370, 379 (5th Cir.2005)("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."), *cert. denied,* 546 U.S. 848, 126 S.Ct. 103, 163 L.Ed.2d 117 (2005).

#### 4. *Conclusion*

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Ring/Apprendi* claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and state habeas corpus proceedings.

### VII. *Brady Claims*

#### A. *The Claims*

In his final claim herein, petitioner argues his rights under the Supreme Court's holding in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when the prosecution withheld from de-

fense counsel information regarding (1) Douglas Bosanko's identification of Jose Hernandez as the Hispanic male Bosanko saw pacing a few miles from Sophia Martinez's abandoned vehicle the night of her murder, (2) Jose Hernandez's then-pending indictment for leaving the scene of an accident, and (3) the photo array containing Hernandez's photograph from which Bosanko had been unable to identify any suspect.[81]

#### B. *State Court Disposition*

In his first three claims for state habeas corpus relief, petitioner similarly complained about the prosecution's failure to disclose to petitioner's defense counsel information regarding (1) Hernandez's indictment, (2) Bosanko's identification of Hernandez and the photo array containing Hernandez's photograph, and (3) mistakes made during DNA testing of petitioner's body fluids at the FBI laboratory.[82]

The state habeas trial court found (1) both Hernandez and his girlfriend furnished police with written statements on March 13, 2000 detailing Hernandez's alibi, (2) the same date police showed Bosanko a photo array containing Hernandez's photograph but Bosanko was unable to identify anyone in the array, (3) police then brought Bosanko to a police station, where they arranged for Bosanko to view Hernandez one-on-one behind through a two-way mirror, (4) police "cleared" Hernandez once his alibi checked out, (5) Bosanko testified at trial Hernandez was the person whom he had identified to police following the one-on-one show-up at the police station, (6) petitioner's jury was aware of evidence at the guilt-innocence phase of trial that Bosanko had identified Hernandez as the Hispanic male whom Bosanko

---

**81.** Petition, at pp. 35–40; Reply, at pp. 15–17.

**82.** State Habeas Transcript, Volume I, at pp. 30–48.

saw pacing several miles from Sophia Martinez's abandoned vehicle on the night of her murder, (7) the photo array from which Bosanko had been unable to select Hernandez's photograph was not furnished to defense counsel until the punishment phase of trial, and (8) petitioner's defense were well aware prior to trial that Hernandez had once been a suspect and petitioner's defense counsel had subpoenaed Hernandez as a potential witness.[83]

The state habeas trial court concluded (1) the prosecution's failure to disclose Hernandez's then-pending indictment to the defense was not "material" for *Brady* purposes and (2) because the favorable information regarding to Bosanko's identification of Hernandez was brought to the jury's attention during the guilt-innocence phase of trial, the alleged non-disclosure of this information and the photo array containing Hernandez's photograph was not "material" for *Brady* purposes.[84]

The Texas Court of Criminal Appeals adopted the state habeas trial court's findings, conclusions, and recommendation that state habeas relief be denied. *Ex parte Berkley,* WR no. 63,079–01, 2006 WL 561467 (Tex.Crim.App. March 8, 2006).

## C. AEDPA Review

### 1. Trial Court Proceedings

During the guilt-innocence phase of petitioner's trial, petitioner's defense counsel called Douglas Bosanko, who testified (1) he was unable to select anyone from the photo array shown him on March 13, 2000,

(2) he was initially unable to identify the Hispanic male whom he was shown at the police station until that individual read a statement and Bosanko recognized that individual's voice as that of the person Bosanko had seen pacing at an intersection a few miles from where Sophia Martinez's vehicle had been abandoned on the night of her murder, (3) he was certain he had identified the person whom he was shown in person on March 13, 2000, but (4) he could not identify the person with whom he briefly spoke at the intersection in question on the night of the murder as the same person whom he had seen exiting Sophia Martinez's vehicle more than an hour earlier several miles up the road from the intersection.[85] The defense then rested at the guilt-innocence phase of trial.

In rebuttal, the prosecution called two El Paso Police officers who testified they recalled that Bosanko had been unable to identify anyone, either in the photo array or during the one-on-one show-up on March 13, 2000.[86] The prosecution also called Jose Hernandez, who testified (1) he was at his parents' home with his girlfriend the night of Sophia Martinez's murder, (2) when police attempted to intimidate him by suggesting he had been identified by a witness, he vigorously denied any involvement in Sophia's murder and yelled at police to take his fingerprints, and hair and blood samples, and (3) he gave police a true and correct written statement detailing his activities on

---

**83.** State Habeas Transcript, Volume II, at pp. 595–603.

**84.** *Id.,* at pp. 614–18.

**85.** S.F. Trial, Volume 71, testimony of Douglas Richard Bosanko, at pp. 11–18, 26, 31, 33–34, 36, 38, 41, 43–45, 62–63.

**86.** S.F. Trial, Volume 71, testimony of Jesus Pantoja, Jr., at pp. 67–92; testimony of Antonio Tabullo, at pp. 93–109.

Detective Pantoja also testified he was uncertain whether the photo array containing Hernandez's photograph which had been shown to Bosanko on March 13, 2000 was still in existence. *Id.,* testimony of Jesus Pantoja, Jr., at p. 83.

the night of the murder.[87]

Subsequent to the conclusion of the guilt-innocence phase of petitioner's trial, on April 19, 2002, the prosecution advised petitioner's defense counsel in open court that Jose Hernandez was under indictment and had been under indictment at the time he testified at petitioner's trial.[88]

### 2. *Clearly Established Federal Law*

■■■■■ Few constitutional principles are more firmly established by Supreme Court precedent than the rule that " 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *Gutierrez v. Dretke*, 392 F.Supp.2d 802, 850 (W.D.Tex.2005), *CoA denied*, 201 Fed.Appx. 196 (5th Cir. 2006), *cert. denied*, — U.S. ——, 127 S.Ct. 1297, 167 L.Ed.2d 112 (2007). The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment, i.e., the rule announced in *Brady v. Maryland*, applies even when there has been no request by the accused. *Banks v. Dretke*, 540 U.S. at 690, 124 S.Ct. at 1272; *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). This duty also applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280, 119 S.Ct. at 1948; *United States v. Bagley*, 473 U.S. 667, 676 & 685, 105 S.Ct. 3375, 3380 & 3385, 87 L.Ed.2d 481 (1985).

■■■■ The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler v. Greene*, 527 U.S. at 280–81, 119 S.Ct. at 1948; *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995). "[T]he individual prosecutor has a duty to learn of any favorable evidence *known to the others acting on the government's behalf* in this case, including the police." *Strickler v. Greene*, 527 U.S. at 281, 119 S.Ct. at 1948 (emphasis added); *Kyles v. Whitley*, 514 U.S. at 437, 115 S.Ct. at 1567.

■■■■ Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non-disclosure. *Banks v. Dretke*, 540 U.S. at 691, 124 S.Ct. at 1272; *Strickler v. Greene*, 527 U.S. at 281–82, 119 S.Ct. at 1948. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Banks v. Dretke*, 540 U.S. at 698–99, 124 S.Ct. at 1276.

■■■ The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383(expressly adopting the "prejudice" prong of the *Strickland v. Washington*,

---

**87.** S.F. Trial, Volume 71, testimony of Jose Hernandez, at pp. 111–28.

**88.** S.F. Trial, Volume 72, at pp. 196–212.

466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady* ). Second, the materiality standard is not a sufficiency of the evidence test. *Kyles v. Whitley*, 514 U.S. at 434–35, 115 S.Ct. at 1566. Third, once materiality is established, harmless error analysis has no application. *Kyles v. Whitley*, 514 U.S. at 435–36, 115 S.Ct. at 1566–67. Finally, materiality must be assessed collectively, not item by item. *Kyles v. Whitley*, 514 U.S. at 436–37, 115 S.Ct. at 1567.

### 3. *Withheld Information Not Material*

 This Court will assume petitioner has satisfied all elements of his *Brady* claim save for the materiality issue, i.e., that the prosecution suppressed or withheld favorable information from petitioner's trial counsel.[89] Concession of a disclosure obligation under *Brady* does not concede a *Brady* violation. *Strickler v.*

*Greene*, 527 U.S. at 281, 119 S.Ct. at 1948; *Dickson v. Quarterman*, 462 F.3d 470, 479 n. 6 (5th Cir.2006). Because this Court finds none of the information identified by petitioner as having been withheld or suppressed by the prosecution satisfies the materiality standard of *Brady*, petitioner is entitled to no federal habeas relief from this Court.

### a. *Bosanko's Identification Testimony*

 The first of petitioner's *Brady* claims is a small horse soon curried. Petitioner's trial counsel were well aware during petitioner's trial of the potentially favorable testimony Douglas Bosanko could furnish to petitioner. They called Bosanko to testify at the guilt-innocence phase of petitioner's trial. Bosanko gave petitioner's jury an account of what he observed the night of Sophia Martinez's murder, as well as the fact he subsequently identified a Hispanic male he had seen in

**89.** Nothing in this opinion should be construed as approving or otherwise placing this Court's imprimatur on the state habeas trial court's factual findings and legal conclusions suggesting the petitioner's prosecutors could escape their constitutional duties under *Brady* by failing to check the criminal record of their own trial witness, Jose Hernandez. As this Court recently explained at great length in its opinion in *Avila v. Quarterman*, 499 F.Supp.2d 713, 747–49 (W.D.Tex.2007), clearly established federal law requires the prosecution to disclose information favorable to the defense which is outside the personal knowledge of the responsible individual prosecutors. *See Strickler v. Greene*, 527 U.S. at 280–81, 119 S.Ct. at 1948(the rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor); *Kyles v. Whitley*, 514 U.S. at 438, 115 S.Ct. at 1568 (holding the same). The prosecution's duty of disclose under *Brady* exists regardless of the extent of a responsible prosecutor's personal knowledge. *See Banks v. Dretke*, 540 U.S. at 691, 124 S.Ct. at 1272(" 'the suppression by the prosecution of evidence favorable to an accused upon re-

quest violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' "); *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. at 1196–97 (holding the same); *Dickson v. Quarterman*, 462 F.3d 470, 479 (5th Cir.2006)("a prosecutor faithfully discharges his duty where he fully understands his obligations under *Brady*, not where, as here, he fails to 'consciously think about it one way or the other.' ").

Prosecutors may not circumvent their constitutional duty under *Brady* by permitting the prosecuting agency of which they are a part to either insulate individual prosecutors from information favorable to the defendants whom they prosecute or by institutionally compartmentalizing information such as arrest and indictment records of prosecution witnesses. *See Strickler v. Greene*, 527 U.S. at 281, 119 S.Ct. at 1948("[T]he individual prosecutor has a duty to learn of any favorable evidence *known to the others acting on the government's behalf* in this case, including the police." (emphasis added)); *Kyles v. Whitley*, 514 U.S. at 437, 115 S.Ct. at 1567 (holding the same).

the police station as the same person he saw pacing near an intersection a few miles from the spot where Sophia's vehicle was abandoned. The problem with Bosanko's testimony, from a *Brady* materiality standpoint, is that nothing in Bosanko's testimony cast any doubt upon the credibility of petitioner's two written statements to police in which petitioner confessed to having fatally shot Sophia Martinez after robbing her and while still in the course of kidnaping her. Petitioner's jury was well aware at the guilt-innocence phase of petitioner's trial of every bit of favorable information Douglas Bosanko could furnish petitioner. Yet petitioner's jury convicted petitioner of capital murder. Petitioner's written confessions left no room for reasonable doubt as to petitioner's guilt on the charge of capital murder. Petitioner has alleged no facts showing a reasonable probability exists that, but for the failure of the prosecution to disclose Bosanko's identification of Hernandez to petitioner's defense counsel prior to the date said counsel did become aware of that information, the outcome of either phase of petitioner's capital trial would have been different.

### b. *Jose Hernandez's Then–Pending Indictment*

Jose Hernandez had an alibi for the night of Sophia's murder which was contradicted by nothing other than the dubious identification testimony of Douglas Bosanko. Significantly, Bosanko repeatedly testified he could not identify the Hispanic male he saw at an isolated rural intersection several miles from where Sophia's vehicle was abandoned as the same "figure" he had seen more than an hour earlier exiting Sophia's vehicle more than twenty feet off the highway as he sped past that location. Hernandez was under indictment at the time of petitioner's trial for an offense (leaving the scene of an accident) which occurred after Sophia's murder and had no relationship to either Sophia's murder or petitioner's confessions. Hernandez testified at trial he was home watching movies on television the night of Sophia's murder from the time several hours before Sophia's abduction when he returned from having picked up his girlfriend until he took his girlfriend to her home around 2 a.m. the following morning. Even if petitioner's trial counsel had been made aware of Hernandez's indictment and employed this information to impeach Hernandez's credibility, there is no reasonable probability the outcome of either phase of petitioner's capital trial would have been different. Impeaching Hernandez regarding his whereabouts the night of Sophia's murder would not have established that Hernandez had any involvement in Sophia's murder. Furthermore, even if petitioner's trial counsel had established Hernandez's presence at the rural location where Bosanko saw a Hispanic male pacing on the night of Sophia's murder, that fact would have had no relevance, legally or factually, to the credibility of petitioner's written confessions, given two days apart, to police following petitioner's arrest and receipt of numerous admonitions regarding his Miranda rights. Petitioner was convicted based on his own confessions. Hernandez's presence at the location where Bosanko saw a Hispanic male pacing would not have reduced the compellingly inculpatory impact of petitioner's written confessions or furnished petitioner with any mitigating evidence.

### c. *The Missing Photo Array*

Bosanko testified without contradiction that he was unable to identify anyone in the photo array police showed him on March 13, 2000. Two El Paso Police officers testified Hernandez's photograph was included in this array and one of the

officers testified he was unaware whether that array was still in existence at the time of petitioner's trial.[90] Petitioner does not allege any specific facts showing how the photo array in question, assuming it still existed as of the time of petitioner's trial, would have been beneficial to petitioner's efforts to secure either an acquittal or a life sentence. There does not appear to be any genuine issue of material fact now before this Court regarding either the presence of Hernandez's photograph among those in the array in question or Bosanko's inability to identify anyone in that particular array.

### d. Collective Review

*Brady* materiality must be assessed collectively, not item by item. *Kyles v. Whitley,* 514 U.S. at 436–37, 115 S.Ct. at 1567.

Petitioner has alleged no specific facts showing that, had his trial counsel been given a copy of the missing photo array in question and information regarding Hernandez's indictment on an unrelated charge prior to petitioner's trial, petitioner's trial counsel could have located, identified, or otherwise developed any evidence which would have been beneficial to petitioner's efforts to secure either an acquittal or a life sentence. Petitioner's own written confessions established every element of the capital murder charge against him beyond any reasonable doubt. Assuming all of the information petitioner has identified in his *Brady* claim herein was withheld or suppressed by the prosecution, there is no reasonable probability the jury would have found petitioner's written confessions any less compelling.

### 4. Conclusion

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Bra-*

dy claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and state habeas corpus proceedings.

### VIII. *Request for Evidentiary Hearing*

■ Petitioner requests an evidentiary hearing to further develop his claims herein. However, the AEDPA limits the circumstances in which a habeas corpus petitioner may obtain an evidentiary hearing in federal court, imposing a significant burden on petitioners who fail to diligently develop the factual bases for their claims in state court. *See Williams v. Taylor,* 529 U.S. 420, 433–34, 120 S.Ct. 1479, 1489, 146 L.Ed.2d 435 (2000)(prisoners who are at fault for the deficiency in the state court record must satisfy a heightened standard to obtain an evidentiary hearing); 28 U.S.C. § 2254(e)(2). "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor,* 529 U.S. at 437, 120 S.Ct. at 1491. Under the AEDPA, if a petitioner failed to develop the factual basis of a claim in state court, he is entitled to a federal evidentiary hearing only if: (1) the claim relies on either (a) a new rule of constitutional law, made retroactive on collateral review by the Supreme Court, that was previously unavailable or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence and (2) the facts underlying the claim are sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable fact-finder would have

---

**90.** *See* note 85, supra.

found the petitioner guilty of the underlying offense. *Foster v. Johnson,* 293 F.3d 766, 775 n. 9 (5th Cir.2002), *cert. denied,* 537 U.S. 1054, 123 S.Ct. 625, 154 L.Ed.2d 532 (2002); *Dowthitt v. Johnson,* 230 F.3d 733, 757 (5th Cir.2000), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); 28 U.S.C. § 2254(e)(2).

■ The state habeas court denied petitioner the evidentiary hearing which ordinarily serves as an essential prerequisite to efficacious AEDPA review. *See Hernandez v. Johnson,* 108 F.3d 554, 558 & n. 4 (5th Cir.1997)(holding that, under the AEDPA, the proper forum for the making of all factual determinations in habeas cases will shift to the state courts "where it belongs" and recognizing the AEDPA clearly places the burden on the federal habeas petitioner "to raise and litigate as fully as possible his potential federal claims in state court"), *cert. denied,* 522 U.S. 984, 118 S.Ct. 447, 139 L.Ed.2d 383 (1997); 28 U.S.C. § 2254(e)(1).

However, petitioner's complaints about the trial court's denial of his challenge for cause to venire member Lucero are necessarily circumscribed by the voir dire answers Lucero gave. Additionally, because this Court must defer to the state trial court's implicit factual findings regarding bias, the record cannot be supplemented by further evidence at this juncture. Petitioner's second, third, and fourth claims herein present pure questions of law which do not necessitate further factual or evidentiary development. Petitioner did not allege any facts in support of his *Brady* claims in the state habeas court which were not already fully developed by the time petitioner completed his state direct appeal. Finally, the state habeas court

disposed of petitioner's *Brady* claims on a purely legal basis, i.e., by concluding none of the allegedly withheld information satisfied the materiality prong of *Brady.*

Significantly, petitioner does not present this Court with any *extra-record* claims of ineffective assistance by his trial or state appellate counsel. Both the Fifth Circuit and this Court have previously explained the necessity for full factual development of "extra-record" complaints about the performance of a state trial or appellate counsel, i.e., allegedly deficient performance occurring outside the state trial or appellate record. *See Neal v. Puckett,* 286 F.3d at 237(recognizing that, in evaluating the performance of trial counsel against a claim that said counsel failed to investigate and present mitigating evidence, the relevant inquiry focuses on what counsel did to prepare for sentencing, what mitigating evidence counsel accumulated, what additional leads counsel had, and the results said counsel might reasonably have expected from those leads); *Gutierrez v. Dretke,* 392 F.Supp.2d at 875–76 (recognizing the burden on a habeas petitioner asserting a *Wiggins* claim includes demonstrating that, in light of the potentially mitigating evidence available at the time of trial, his trial counsel's efforts to investigate, develop, and present potentially mitigating evidence were objectively unreasonable). Because petitioner did not present this Court with any "extra-record" allegations of ineffective assistance by his state trial or appellate counsel, there is no need for a federal evidentiary hearing to develop such claims herein. Under the peculiar circumstances of this case, petitioner is not entitled to a federal evidentiary hearing on the claims he has presented to this Court.[91]

---

**91.** This Court expresses no opinion on whether a federal evidentiary hearing would be necessary if petitioner had presented this Court with the same "extra-record" ineffec-

tive assistance claims he included as grounds four, six, and eight in his state habeas corpus application. The AEDPA presupposes that a federal habeas petitioner has been given an

## IX. *Certificate of Appealability*

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998).

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000)(holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997)(holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). To make such a showing, the petitioner need not show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. at 2569; *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v.*

adequate opportunity to develop the factual bases underlying his federal constitutional claims in a previous state proceeding. In an appropriate case, the refusal of a state habeas court to afford an evidentiary hearing to develop facially valid "extra-record" federal constitutional claims might very well raise questions as to the efficacy of the state habeas court's factual findings and legal conclusions under the AEDPA or otherwise mandate a federal evidentiary hearing be held to develop facts which the state courts have refused to permit the petitioner to develop in state proceedings. 28 U.S.C. §§ 2244(c) & 2254(b)(1)(B).

*Estelle,* 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is authorized to address the propriety of granting a CoA sua sponte. *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000).

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell,* 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604(holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Foster v. Quarterman,* 466 F.3d 359, 364 (5th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 2099, 167 L.Ed.2d 817 (2007); *Dickson v. Quarterman,* 462 F.3d 470, 476 (5th Cir.2006); *Pippin v. Dretke,* 434 F.3d 782, 787 (5th Cir.2005), *cert. denied,* —— U.S. ——, 127 S.Ct. 351, 166 L.Ed.2d 49 (2006); *Bridgers v. Dretke,* 431 F.3d 853, 861 (5th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 2961, 165 L.Ed.2d 959 (2006). Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See, e.g., Scheanette v. Quarterman,* 482 F.3d at 828–29 (holding petitioner not entitled to a CoA on *Ring/Apprendi* claim virtually identical to that presented in this cause); *Turner v. Quarterman,* 481 F.3d at 301–02 (holding petitioner eligible for CoA on neither ineffective assistance, *Ring,* nor "failure to inform jury of the effect of a hung jury" claims); *Sonnier v. Quarterman,* 476 F.3d at 364–69 (denying CoA on a wide variety of innovative challenges to the Texas capital sentencing scheme).

None of petitioner's claims herein satisfy the standard for obtaining a CoA. Petitioner's first claim herein possesses no arguable merit. Reasonable jurists could not disagree regarding the reasonableness of the state trial court's rejection of petitioner's challenge for cause to venire member Lucero. Any confusion or inconsistency in Lucero's voir dire answers was the product of the confusing, ambiguous, and at-times legally erroneous information counsel for both parties attempted to convey to Lucero.[92] Counsel for both parties repeatedly admonished Lucero that he could not answer the Texas capital sentencing scheme's future dangerousness

92. See note 65, supra.

special issues affirmatively based solely upon the evidence which had convinced the jury beyond a reasonable doubt of the defendant's guilt. However, Texas law has long provided that "the facts of the offense alone can be sufficient to support an affirmative answer" to the future dangerousness special issue. *See Dewberry v. State*, 4 S.W.3d at 741("Often the circumstances of the crime provide greater probative evidence of a defendant's probability for committing future acts of violence than any other factor relevant to the future dangerousness special issue."); *Walbey v. State*, 926 S.W.2d at 310(holding the facts of the offense alone can support an affirmative answer to the future dangerousness special issue); *Rousseau v. State*, 855 S.W.2d at 684–85 (holding the same); *Allridge v. State*, 850 S.W.2d at 488 (holding the same). Contrary to the misinformation conveyed to Lucero by counsel for both parties during Lucero's voir dire examination, *in an appropriate case* Texas capital sentencing jurors may answer the future dangerousness special issue affirmatively even if the prosecution rests at the punishment phase of trial without presenting any additional evidence. *Dewberry v. State*, 4 S.W.3d at 741. Lucero's answers to his voir dire examination did not disclose that he was substantially impaired in his ability to put aside his own preconceptions and personal beliefs and return a verdict based upon the evidence presented to the jury and the law as given by the state trial court.

Reasonable jurists could not disagree that petitioner's second claims herein is foreclosed by the majority holding in *Schad v. Arizona*. The Fifth Circuit has held a claim virtually identical to petitioner's *Beck* claim herein undeserving of a CoA. *Pippin v. Dretke*, 434 F.3d at 791. Likewise, the Fifth Circuit has held a claim identical to petitioner's *Ring/Apprendi* claim herein to be unworthy of a CoA. *Scheanette v. Quarterman*, 482 F.3d at 828–29.

Petitioner's *Brady* claims possess no arguable merit. Petitioner complains the prosecution failed to advise petitioner's trial counsel prior to trial regarding Douglas Bosanko's personal knowledge of information favorable to petitioner. However, it is undisputed petitioner's trial counsel learned of this same information during trial and called Bosanko as a witness at the guilt-innocence phase of petitioner's trial. Nothing in Bosanko's trial testimony cast any doubt on the accuracy or credibility of petitioner's two written statements to police in which petitioner confessed to having robbed and kidnaped Sophia Martinez at gunpoint before fatally shooting her multiple times in the face. Petitioner does not allege any facts showing a reasonable probability that, but for the failure of the prosecution to reveal Bosanko's possession of information favorable to petitioner *prior to trial*, the outcome of either phase of petitioner's trial would have been different. The same analysis holds true for the indictment of Hernandez.

Therefore, petitioner is not entitled to a CoA on any of his claims herein.

Accordingly, it is hereby **ORDERED** that:

1. All of petitioner's claims for federal habeas corpus relief in this cause are **DENIED.**

2. Petitioner's request for an evidentiary hearing is **DENIED.**

3. Petitioner is **DENIED** a Certificate of Appealability.

4. All other pending motions are **DISMISSED** as moot.